No. 5　　　　　March 14, 2024　　　　　81

IN THE SUPREME COURT OF THE
STATE OF OREGON

MATTHEW DWIGHT THOMPSON,
*Appellant,*

*v.*

Corey FHUERE,
Superintendent,
Oregon State Penitentiary,
*Respondent.*

(CC 20CV29516) (CA A179314) (SC S070162)

En Banc

On certification from the Court of Appeals under ORS 19.405.*

Argued and submitted September 19, 2023.

Jeffrey E. Ellis, Law of Office of Alsept & Ellis, Portland, argued the cause and filed the briefs for appellant.

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause and filed the briefs for respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

GARRETT, J.

The judgment of the post-conviction court is affirmed.

--------------

* Appeal from Marion County Circuit Court, Thomas M. Hart, Judge.

**GARRETT, J.**

Petitioner committed capital crimes in 1994 and was sentenced to death. Decades later, petitioner filed a successive petition for post-conviction relief, claiming that his death sentence and two of the penalty-phase questions that had been posed to the jury at sentencing were unconstitutional. Because of then-recent changes in the law, the parties agreed that petitioner's death sentence had to be vacated. However, the parties disagreed about the proper remedy. The superintendent requested that the post-conviction court modify petitioner's sentence to life without the possibility of parole, while petitioner sought to remand the case for resentencing. The post-conviction court vacated petitioner's death sentence, modified his sentence to life without the possibility of parole, and ruled that his remaining claims concerning the penalty-phase questions were procedurally barred.

Petitioner appealed the judgment to the Court of Appeals, arguing, among other things, that the post-conviction court had erred by failing to remand the case for resentencing. While petitioner's appeal was pending, then-Governor Kate Brown commuted the death sentences of 17 individuals—including petitioner—to sentences of life without the possibility of parole. We accepted certification from the Court of Appeals to consider, among other issues, the effect of the Governor's commutation on this case. *See* ORS 19.405 (describing procedures for certification of an appeal). For reasons that we will explain, we conclude that petitioner has presented no basis for reversing the post-conviction court's judgment. Petitioner's argument that he is entitled to a remand for resentencing because the death sentence that he originally received was unconstitutional fails because, as a result of the Governor's commutation, petitioner is not serving a death sentence. Further, petitioner failed to preserve his challenge to the post-conviction court's ruling that his constitutional challenges to the two penalty-phase questions were procedurally barred, and, for that reason, we do not reach the merits of petitioner's constitutional challenges to those questions. Accordingly, we affirm.

## I.   BACKGROUND AND PROCEDURAL HISTORY

### A.   *History of the Case*

The basic procedural facts are undisputed. Petitioner was convicted of four counts of aggravated murder involving the murder of two victims in 1994. Two counts were based on the aggravating circumstance that petitioner had committed multiple murders as part of the same criminal episode. ORS 163.095(1)(d) (1993). The other two counts were based on the aggravating circumstance that he had "personally and intentionally committed" murder in the course of and in furtherance of committing or attempting to commit a statutorily enumerated felony (*i.e.*, first-degree burglary in one count and first-degree robbery in the second count). ORS 163.095(2)(d) (1993); ORS 163.115(1)(b)(C), (G) (1993).

During the penalty phase, the jury was instructed that there were three possible penalties: death, life imprisonment without the possibility of parole, and life imprisonment with the possibility of parole. As described in more detail below, 372 Or at 85-86, 85 n 3, the jury answered certain questions that were legally required at that time for the imposition of a death sentence, including two pertaining to whether petitioner posed a "continuing threat" and whether he "deserved death." Petitioner was sentenced to death.[1]

On automatic and direct review, this court affirmed the judgment of conviction and sentence of death. *State v. Thompson*, 328 Or 248, 971 P2d 879, *cert den*, 527 US 1042 (1999). Petitioner then sought post-conviction relief, challenging his convictions and sentence on numerous grounds. The Court of Appeals affirmed the post-conviction court's judgment denying petitioner relief, and this court denied review.[2] *Thompson v. Belleque*, 268 Or App 1, 341 P3d 911 (2014), *rev den*, 357 Or 300 (2015).

---

[1] Petitioner was sentenced to death on each of the four counts of aggravated murder. *State v. Thompson*, 328 Or 248, 253 n 2, 971 P2d 879, *cert den*, 527 US 1042 (1999). For convenience, however, we refer to those sentences collectively as either petitioner's "sentence" or "death sentence."

[2] Petitioner then filed a petition for a writ of habeas corpus in federal district court. *Thompson v. Premo*, No 6:15-cv-01313-SI (D Or 2015). That case is currently stayed pending the outcome of this appeal.

B.  *Senate Bill 1013*

Several years later, in 2019, the legislature passed Senate Bill (SB) 1013, which significantly changed Oregon's death penalty statutes. Or Laws 2019, ch 635; *see State v. Bartol*, 368 Or 598, 496 P3d 1013 (2021) (describing SB 1013, its legislative history, and its effects). As pertinent here, SB 1013 "created a new category of murder, 'murder in the first degree'; reclassified all the forms of murder that previously had been 'aggravated murder' as 'murder in the first degree'; and provided a maximum sentence of life imprisonment without the possibility of parole for 'murder in the first degree.'" *Bartol*, 368 Or at 601 (citing Or Laws 2019, ch 635, §§ 1, 3(1), (2)). Thus, SB 1013 eliminated the death penalty for all the forms of murder that previously had been eligible for it, which included the forms that petitioner had committed.

"SB 1013 did not eliminate the death penalty entirely[,]" however. *Id.* at 601. Instead, SB 1013 "redefined 'aggravated murder' to include different forms of murder, most of which are more serious forms of murder than those *** previously *** classified as 'aggravated murder[,]'" and provided that those forms of aggravated murder can be punished by death. *Id.* 601-02; *see id.* at 602 n 2 (describing conduct constituting aggravated murder under SB 1013).

In addition, SB 1013 changed the requirements for imposing a death sentence. "Prior to SB 1013, the jury had to answer four questions in the affirmative in order for a defendant to be sentenced to death." *Bartol*, 368 Or at 602 n 3 (citing ORS 163.150(1)(b) (2013), *amended by* Or Laws 2019, ch 635, § 5).[3] Specifically, ORS 163.150(1)(b) (2013) provided:

"Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(A)   Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

---

[3] The penalty-phase questions in ORS 163.150(1)(b) (2013) that we discussed in *Bartol* were same questions that had applied when petitioner was sentenced to death.

"(B)   Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C)   If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D)   Whether the defendant should receive a death sentence."

Under that statute, if the jury answered any of those four questions in the negative, a death sentence could not be imposed. Instead, the trial court was required to sentence the defendant to life imprisonment without the possibility of parole, unless "10 or more members of the jury further [found] that there [were] sufficient mitigating circumstances" to warrant life imprisonment with the possibility of parole, in which case the trial court was required to impose that lesser sentence. ORS 163.150(2)(a) (2013).

SB 1013 eliminated the second of the four questions, ORS 163.150(1)(b)(B) (2013), relating to whether a defendant constitutes a "continuing threat." *Bartol*, 368 Or at 602 n 3. The bill also added a "'proof beyond a reasonable doubt'" standard to the question of whether a defendant "should receive a death sentence." *Id.*

Significantly, the legislature did not make SB 1013 retroactive as to sentences imposed before the effective date of the bill. Instead, SB 1013 applied "only to sentencings that occur after its effective date, regardless of when the crime was committed." *State v. Rogers*, 368 Or 695, 700, 499 P3d 45 (2021) (citing Or Laws 2019, ch 635, § 30). This court construed that applicability provision in *Bartol* to demonstrate that "the legislature did not regard conduct committed before the effective date as more culpable than conduct committed after it." *Bartol*, 368 Or at 624. Thus,

"[a]lthough the legislature did not make SB 1013 retroactive as to sentences imposed before its effective date, the enactment of the bill itself reflect[ed] a judgment that conduct that [had been] previously classified as 'aggravated murder' [did] not fall within the narrow category of conduct that [could] be punished by death, as opposed to lesser sentences, including life imprisonment."

368 Or at 625.

*Bartol* held that, so understood, SB 1013 created a proportionality problem under Article I, section 16, of the Oregon Constitution, which provides, in part, that "all penalties shall be proportioned to the nature of the offense." *Id.* at 624. That was so, because SB 1013 allowed "the execution of persons whose conduct the legislature has determined is *not* the worst of the worst and whose culpability is *no different* from those who cannot be executed." *Id.* (emphases in original). Put simply, "whether a person who committed conduct that was previously classified as 'aggravated murder' but is now classified as 'murder in the first degree' can be sentenced to death depends on the person's sentencing date, not on the relative gravity of the conduct." *Id.*

Accordingly, in *Bartol*—a death penalty case on automatic and direct review—we explained that carrying out that defendant's death sentence

> "would allow the execution of a person for conduct that the legislature has determined no longer justifies that unique and ultimate punishment, and it would allow the execution of a person for conduct that the legislature has determined is no more culpable than conduct that should not result in death."

*Id.* at 625. Having concluded that the defendant's death sentence violated Article I, section 16, we vacated the sentence and remanded the case for resentencing. *Id.* at 626; *see Rogers*, 368 Or at 701 (same).

C.   *Petitioner's Post-Conviction Proceeding*

Following the enactment of SB 1013 and the issuance of our decisions in *Bartol* and *Rogers*, petitioner filed the successive post-conviction petition that is the subject of this appeal. He raised the following three claims for relief.[4]

In his first claim, petitioner asserted that his death sentence was unconstitutional. He explained that, pursuant to SB 1013, the conduct that he had been found guilty of committing was no longer classified as aggravated murder and was no longer punishable by death; thus, under the holdings in *Bartol* and *Rogers*, his death sentence was unconstitutional.

---

[4] Petitioner alleged two additional claims that were voluntarily dismissed.

    In his second claim, petitioner contended that the "continuing threat" question that had been posed to the jury in his case was unconstitutional (*i.e.*, the second penalty-phase question, ORS 163.150(1)(b)(B) (2013) ("[w]hether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society")). According to petitioner, that question failed to serve its constitutionally required function to rationally "narrow the class of death-eligible criminal defendants." In support of that proposition, petitioner referred to empirical evidence, including research pertaining to jurors' ability to predict future dangerousness. He further asserted that the elimination by SB 1013 of the "continuing threat" question was an acknowledgment that the question "did not comport with the current understanding of modern circumstances and contemporary standards of decency."

    In his third claim, petitioner challenged the constitutionality of the version of the "deserves death" question that was posed to his jury (*i.e.*, the fourth penalty-phase question, ORS 163.150(1)(b)(D) (2013) ("[w]hether the defendant should receive a death sentence")). As noted above, that version of the question did not require proof beyond a reasonable doubt, which, according to petitioner, made the question inconsistent both with "[m]odern circumstances and contemporary standards of decency," and with the intent of the voters when they reinstated the death penalty in 1984. Again, petitioner cited SB 1013 in support of that claim.

    As a remedy for each of those three claims, petitioner asked the post-conviction court to vacate his death sentence and remand the case to the trial court for resentencing under the provisions of SB 1013.

    The parties filed cross-motions for summary judgment. *See* ORCP 47 C (providing that summary judgment shall be granted if "there is no genuine issue as to any material fact and *** the moving party is entitled to prevail as a matter of law"). With regard to petitioner's first claim, they agreed that petitioner's death sentence had to be vacated, but disagreed as to the remedy. Petitioner argued that a remand for resentencing under the provisions of SB 1013 was required; the superintendent countered that the post-conviction court

could modify petitioner's sentence to life without the possibility of parole because that was the only legally permissible sentence—that is, it was "the next lower sentence that [was] both statutorily authorized and constitutionally permissible" based on the jury's findings. The parties also had differing views about petitioner's remaining two claims concerning the "continuing threat" and "deserves death" questions, which the post-conviction court would need to address if it declined to remand for resentencing on petitioner's first claim. Petitioner contended that, if the post-conviction court concluded that either question was unconstitutional, a remand for resentencing was required; the superintendent argued that the claims were procedurally barred, were moot in light of the parties' agreement that the death sentence had to be vacated, and, in all events, lacked merit.

Following a hearing, the post-conviction court granted petitioner summary judgment, in part, on his first claim (*i.e.*, the court vacated petitioner's death sentence). But, as the superintendent had requested, instead of remanding, the court modified the judgment of conviction pursuant to ORS 138.520 to impose a sentence of life without the possibility of parole on each of petitioner's four aggravated murder convictions. *See* ORS 138.520 (providing that the relief that a post-conviction court may order "shall include * * * modification of sentence"). As to petitioner's remaining two claims concerning the penalty-phase questions, the post-conviction court granted summary judgment to the superintendent, concluding that petitioner's claims were procedurally barred under ORS 138.510(3) and ORS 138.550(3). *See* ORS 138.510(3) (providing, as pertinent here, that "[a] petition * * * must be filed within two years" of the date of the denial of *certiorari* "unless the court on hearing a subsequent petition finds grounds for relief asserted which could not reasonably have been raised in the original or amended petition"); ORS 138.550(3) (providing, in part, that "[a]ll grounds for relief * * * must be asserted in the original or amended petition, and any grounds not so asserted are deemed waived unless the court on hearing a subsequent petition finds grounds for relief asserted therein which could not reasonably have been raised in the original or amended petition"). Specifically, the court ruled that the constitutionality of those questions

previously had been challenged in this court and upheld, and that petitioner had "had direct appeal, post-conviction \*\*\*, and other options" to challenge them.

## D.   *The Governor's Commutation*

While petitioner's appeal of the post-conviction court's judgment was pending in the Court of Appeals, then-Governor Brown commuted petitioner's death sentence to life in prison without the possibility of parole. The Governor's order stated that it was "limited to reducing [petitioner's] death sentence to life in prison without the possibility of parole" and did "not in any way affect the underlying criminal conviction." According to the Governor, her action "remove[d] the possibility" that petitioner would be "put to death" and brought "all of us a significant step closer to finality." However, the order explicitly stated that "[n]othing in [the] Commutation Order [was] intended to preclude [petitioner] from seeking other or further relief from the courts that [he] may be entitled to."[5]

## E.   *The Parties' Appellate Contentions*

Despite the fact that the Governor had issued her commutation around the time that the parties were filing their briefs in the Court of Appeals, that briefing paid relatively little, if any, attention to the legal effect of the commutation on this case. Petitioner's briefing focused on

---

[5] In the same commutation order, Governor Brown also commuted the death sentences of 16 other people. The order provided, in pertinent part:

"[B]y virtue of the authority vested in me under Article V, Section 14, of the Oregon Constitution, I, Kate Brown, Governor of the State of Oregon, hereby commute the death sentence of each Commutee, in the respective case referenced in Exhibit A, to life in prison without the possibility of parole, effective as of the 14th day of December, 2022. This Commutation Order is limited to reducing each Commutee's death sentence to life in prison without the possibility of parole, and shall not in any way affect the underlying criminal conviction. Nothing in this Commutation Order is intended to preclude a Commutee from seeking other or further relief from the courts that they may be entitled to. Although in many cases commutations are granted in recognition of extraordinary reform on the part of the individual, that is not the basis for my actions here. Instead, the sole basis for commuting the death sentences of each Commutee to life in prison without the possibility of parole is that the death penalty is dysfunctional and immoral, in all circumstances. My action today removes the possibility that any of these Commutees will be put to death by the State and brings all of us a significant step closer to finality in each of these cases."

the post-conviction court's rulings and raised four assignments of error, contending that the post-conviction court had erred in (1) summarily modifying petitioner's sentence to life without parole instead of remanding for resentencing after it vacated his unconstitutional death sentence; (2) concluding that his claims concerning the penalty-phase questions were "untimely" when the state had "conceded otherwise"; (3) failing to remand for resentencing because the "continuing threat" question was unconstitutional as measured by evolving standards of decency and events that had occurred after petitioner's trial, direct appeal, and prior post-conviction proceeding; and (4) failing to remand for resentencing because the "deserves death" question was unconstitutional for similar reasons. Petitioner's briefing did not mention the Governor's commutation.

The superintendent called the court's attention to the commutation in his answering brief, noting that the Governor's order made it "unnecessary to address the effect of the *Bartol* decision on the validity of the death sentence imposed in petitioner's case." The superintendent also contended that the commutation order "effectively moot[ed]" petitioner's claims concerning the penalty-phase questions and that the court should not consider them. In support of that contention, the superintendent reiterated his argument that the jury's answers to the penalty-phase questions necessarily established that life without the possibility of parole is the proper sentence now that the death sentence cannot be carried out. The Court of Appeals then certified the appeal to this court, and we accepted the certification and received supplemental briefing.

Again, however, the parties' briefing did not devote much attention to the legal effect of the Governor's commutation. Petitioner explained that, although this court's rulings in *Bartol* and *Rogers* "likely made all then-existing death sentences unconstitutional," the commutation had "ended any uncertainty when [the Governor] commuted those sentences" and expressly "preserve[d] all existing rights for every commutee." In other words, petitioner acknowledged that, as a result of the commutation, he is serving the commuted sentence of life without parole, but, nonetheless, contended that

the express terms of the Governor's commutation permitted him to "seek[] other or further relief from the courts that [he] may be entitled to"—including relief that could result in an even lesser sentence than his commuted one.

The relief to which petitioner claims an entitlement is a remand for resentencing, based, as we understand his argument, on four distinct theories. First, because the jury had found petitioner guilty of aggravated murder based on conduct that (under SB 1013) can no longer be punished by death, there is a heightened possibility that his death sentence was influenced by the classification of his conduct as "the worst form of murder" and so created a "bias in favor of the death penalty," and, for that reason, he is entitled to a remand for resentencing. Second, because this court vacated the defendants' unconstitutionally disproportionate death sentences in *Bartol* and *Rogers* and remanded those cases for resentencing, petitioner is entitled to the same remedy for the same constitutional violation. Third, because the post-conviction court had vacated petitioner's death sentence (as both parties had agreed was necessary), he was subject to being resentenced under the provisions of SB 1013. Fourth, because the "continuing threat" and "deserves death" penalty-phase questions that were posed to petitioner's jury were unconstitutional, petitioner is entitled to a remand for resentencing as would be the case with any other prejudicial penalty-phase error.

In his supplemental brief, the superintendent argued that the parties' dispute about the post-conviction court's authority to modify petitioner's sentence had been rendered moot by the Governor's commutation, because petitioner "is no longer subject to a death sentence or the possibility of one, and he is now serving a true-life sentence instead." As a consequence, the superintendent reasoned, "this court need not consider whether ORS 138.520 authorized the post-conviction court to modify the judgment *** to impose a true-life sentence." The superintendent also contended that petitioner was not entitled to a resentencing, because the theories that he had advanced lacked merit.

During oral argument, we sought to further clarify the parties' positions about the legal effect of the commutation

on this case. Both parties agreed that, as a result of the commutation, petitioner is serving a life sentence without the possibility of parole. According to the superintendent, the commutation rendered moot the parties' dispute about the post-conviction court's authority to modify petitioner's sentence, because the Governor did that herself. However, the superintendent conceded that, if we conclude that there was a penalty-phase error that requires a remand for resentencing, the terms of the commutation order do not preclude that relief.

As discussed further below, the Governor's commutation order fundamentally changed the circumstances of this case and the nature of what had been litigated, up to that point, in the post-conviction court. In this appeal of the post-conviction court's judgment resolving petitioner's claims for post-conviction relief, our task is to address whether petitioner's assignments of error present a basis for reversing that judgment—now that petitioner's death sentence has been commuted.

## II. ANALYSIS

To resolve the parties' contentions in this case, we must determine the legal effect of the Governor's commutation order. Accordingly, we begin there.

The Governor has the power to grant clemency, including commutations, under Article V, section 14, of the Oregon Constitution, which provides, in part:

"[The Governor] shall have power to grant reprieves, commutations, and pardons, after conviction, for all offences [*sic*] except treason, subject to such regulations as may be provided by law. Upon conviction for treason he shall have power to suspend the execution of the sentence until the case shall be reported to the Legislative Assembly, at its next meeting, when the Legislative Assembly shall either grant a pardon, commute the sentence, direct the execution of the sentence, or grant a farther [*sic*] reprieve."

The Governor is the "sole repository" of this constitutional clemency power. *Eacret et ux v. Holmes*, 215 Or 121, 126, 333 P2d 741 (1958). This court has repeatedly concluded that "'it is not within judicial competency to control, interfere with,

or even to advise the Governor when exercising [her] power to grant reprieves, commutations, and pardons.'" *Haugen v. Kitzhaber*, 353 Or 715, 720, 306 P3d 592 (2013), *cert den*, 571 US 1167 (2014) (quoting *Eacret*, 215 Or at 125-26); *see also Eacret*, 215 Or at 127 ("Where the constitution thus confers unlimited power on the Governor to grant reprieves, commutations and pardons, his discretion cannot be controlled by judicial decision.").[6]

A Governor's grant of clemency is not a "'*private* act of grace from an individual *happening* to possess power.'" *Haugen*, 353 Or at 742 (quoting *Biddle v. Perovich*, 274 US 480, 486, 47 S Ct 664, 71 L Ed 1161 (1927) (emphases in *Haugen*)). Instead, it is "an important part of the constitutional scheme envisioned by the framers" that "permits the chief executive to determine that 'the public welfare will be better served' by clemency." *Id.* (quoting *Biddle*, 274 US at 486). Ultimately, "[t]he Governor's ability to grant clemency is a direct and complete check on specific actions of the judicial branch that is entrusted to the chief executive." *Id.* at 726.

One form of clemency is a "commutation," which is what petitioner received in this case. *See State v. Link*, 367 Or 625, 663, 482 P3d 28 (2021) ("Commutation *** is an *ad hoc* exercise of executive clemency." (Internal quotation marks omitted.)). A commutation is "a change of punishment to which a person has been condemned to one less severe." *Fehl v. Martin*, 155 Or 455, 459, 64 P2d 631 (1937); *see Black's Law Dictionary* 350 (11th ed 2019) (defining "commutation"

---

[6] "[T]o the extent that limits are imposed on the clemency power, those limits must come from the constitution itself, or from the people." *Haugen*, 353 Or at 726. As we have previously stated, "[t]he most fundamental limit [on the Governor's power] is imposed through the actions of the people, if they choose not to reelect the Governor." *Id.* at 742; *see Eacret*, 215 Or at 128 (noting that, if a Governor abuses the clemency power, the people have recourse "at the polls"). The "text, history, and case law surrounding Article V, section 14," also demonstrate that "the Governor's power may be checked by the legislative branch, as in cases of treason convictions and through the legislature's authority to establish regulations regarding the Governor's power." *Haugen*, 353 Or at 742-43. The legislature has enacted a few statutory provisions addressing the Governor's clemency power. ORS 144.649 - 144.670. "Most of those provisions address procedural issues, such as the procedure for reporting acts of clemency to the legislature and the procedure for applying for clemency." *Haugen*, 353 Or at 727 n 7. The one statutory provision that addresses the scope of the Governor's power, ORS 144.649, "restates the Governor's constitutional power, but also expresses the legislature's intent to defer to the Governor's judgment regarding the exercise of that power[.]" *Id.*

to include "[t]he executive's substitution in a particular case of a less severe punishment for a more severe one that has already been judicially imposed on the defendant"); *see also Duehay v. Thompson*, 223 F 305, 307-08 (9th Cir 1915) (explaining that, in commuting a sentence, "the executive has superimposed its mind upon the judgment of the court; but the sentence remains, nevertheless, the judgment of the court, and not of the executive, and is subject to the regulations of law respecting its enforcement").

In addition, "[a] commuted sentence has the same legal effect as though the sentence had originally been for the commuted term." *Pardon and Parole*, 67A CJS § 6 (2023); *see also, e.g.*, *Pardon and Parole*, 59 Am Jur 2d § 52 (2023) ("In effect, a commuted sentence replaces the sentence imposed by the original judgment. Since it is a mere substitution of a lesser for a greater punishment, it has the same legal effect, and the status of the prisoner is the same as though the sentence had originally been for the commuted term." (Footnote omitted.)). The Court of Appeals has recognized that principle—that is, that a commuted sentence has the same legal effect as though the sentence had originally been for the commuted term—for almost 50 years. *See Marteeny v. Brown*, 321 Or App 250, 288, 517 P3d 343, *rev den*, 370 Or 303 (2022) (explaining that a "commuted sentence stands as though it had originally been for the commuted term, and entitles the offender to benefits of the commuted term—for example good time" (citing *Ferguson v. Cupp*, 23 Or App 122, 124-25, 541 P2d 489 (1975) (internal quotation marks omitted)); *see also Ferguson*, 23 Or App 122 (concluding that, after the Governor unconditionally commuted the petitioner's life sentence for murder to a term of 25 years in 1974, the petitioner was entitled to credits resulting in the reduction of his commuted sentence computed from the date of his original life sentence in 1957 (citing *State ex rel. Murphy v. Wolfer*, 127 Minn 102, 148 NW 896 (1914)); *Murphy*, 127 Minn at 103, 148 NW at 897 ("A few principles applicable to the case are, however, well settled. It is well settled that a commutation of a sentence is a substitution of a less for a greater punishment. After commutation[,] the commuted sentence is the only one in existence, and the only one to be considered. After commutation, the sentence has the same

legal effect, and the status of the prisoner is the same, as though the sentence had originally been for the commuted term.")). Thus, the issuance of a commutation significantly affects the trajectory of a case and the cognizable challenges to the originally imposed judicial sentence.

Applying those general principles is complicated because this case comes to us in an unusual posture. At the time that the Governor commuted petitioner's death sentence to a sentence of life without the possibility of parole, the following key events already had occurred: (1) SB 1013 had been enacted; (2) this court had issued its decisions in *Bartol* and *Rogers*, vacating the defendants' death sentences and remanding their cases so that new sentences could be imposed; (3) petitioner had sought post-conviction relief, claiming that his death sentence and two of the penalty-phase questions were unconstitutional; (4) the parties had agreed that defendant's unconstitutional death sentence had to be vacated but disagreed as to how a new sentence would be determined (*i.e.*, whether the case should be remanded for resentencing or whether the post-conviction court should modify petitioner's sentence to life without the possibility of parole); and (5) petitioner had appealed the post-conviction court's judgment, challenging several of that court's rulings. Nonetheless, while the appeal was pending, the Governor exercised her constitutional authority to commute petitioner's death sentence and to substitute, in its place, a sentence of life without the possibility of parole. Thus, following the commutation, petitioner's sentence of life without the possibility of parole has been imposed, not by judicial decree, but as a function of the Governor's constitutional authority.

However, the commutation order expressly reserved to petitioner the right to seek other or further relief from the courts: "Nothing in this Commutation Order is intended to preclude a Commutee from seeking other or further relief from the courts that they may be entitled to." Therefore, the timing of the Governor's commutation gives rise to the question whether, as petitioner contends in his first assignment of error, he would be entitled to a remand for resentencing if we were to conclude on appeal that the post-conviction court erred in imposing a modified sentence rather than

remanding for a new sentence to be imposed. For the inter-related reasons that follow, we conclude that, in light of the commutation, petitioner is not entitled to such relief.

In response to petitioner's first claim for post-conviction relief, in which he challenged his death sentence as unconstitutional, the post-conviction court vacated the death sentence and modified petitioner's sentence to life without the possibility of parole, rather than remanding for resentencing. On appeal, petitioner contends that the post-conviction court's ruling was erroneous and that his case should have been remanded for a resentencing, where, theoretically, a different and lesser sentence of life with the possibility of parole could be imposed. The problem with petitioner's theory is that, even if we were to assume that the post-conviction court erred at the time that it made its ruling and should have remanded for resentencing, petitioner would not be entitled to that relief on appeal. That is so because the Governor has since exercised her constitutional authority to impose a sentence of life without the possibility of parole. As previously explained, the legal effect of the commutation is that the sentence of life without the possibility of parole stands as if it had been originally imposed. Following the Governor's exercise of her constitutional clemency power, petitioner's judicially imposed sentence is deemed not to have existed, and a new sentence, derived from a different source, became effective as if it were the original sentence.

It is plain that, if the Governor had commuted petitioner's sentence *before* he petitioned for post-conviction relief, or even during the pendency of the post-conviction proceeding, his challenge to the constitutionality of his death sentence would not have been cognizable, because there would have been no death sentence to challenge. The post-conviction court would have had no death-sentence claim to dispose of, and petitioner consequently would have had no opportunity to assign error to any such disposition on appeal. As it happened, the Governor's commutation did not occur until after petitioner had filed his appeal, but that does not change the fact that we must now proceed as if petitioner had received a sentence of life without the possibility

of parole from the beginning. If a post-conviction claim challenging the constitutionality of a nonexistent death sentence is not cognizable, it follows that no assignment of error to the disposition of such a claim can be cognizable, either.

Essentially, petitioner is asking us to resolve this appeal as though the Governor had not stepped in and commuted his sentence to life without the possibility of parole and to ignore the legal effects of that exercise of constitutional authority. We cannot do so. The validity of the Governor's action has not been challenged here—or, to our knowledge, in any other proceeding. The parties agree that petitioner is serving the Governor's commuted sentence. Thus, for present purposes, we must treat the commutation as a valid exercise of the Governor's constitutional authority to impose a new sentence that stands as if it had been the sentence originally imposed.

To the extent that petitioner argues that, regardless of the commutation, he nonetheless remains entitled to a resentencing because that is what SB 1013 required or because he is entitled to the same remedy that the defendants in *Bartol* and *Rogers* received, we disagree. "[T]he legislature did not make SB 1013 retroactive as to [death] sentences imposed before its effective date[.]" *Bartol*, 368 Or at 625. Instead, SB 1013 applied only to sentencings that occurred thereafter. *Rogers*, 368 Or at 700. Thus, SB 1013 itself did not provide an entitlement to a resentencing. Instead, that entitlement must be found elsewhere. As to petitioner's argument concerning *Bartol* and *Rogers*, the circumstances of this case are qualitatively different. In those cases, the defendants were serving unconstitutional death sentences, and, on direct appeal, we vacated those sentences and remanded for resentencing so that a new sentence could be imposed. Here, unlike the defendants in *Bartol* and *Rogers*, petitioner is not serving a death sentence. Instead, he is serving the commuted sentence of life without parole. Petitioner's argument that he is entitled to the same remedy as the defendants in *Bartol* and *Rogers* ignores the fact that the Governor commuted his sentence.

In sum, in his first assignment of error on appeal, petitioner contends that, having vacated his death sentence,

the post-conviction court erred in declining to remand for resentencing so that a new sentence could be imposed. However, the Governor has since exercised her constitutional authority to commute petitioner's death sentence and impose a new sentence of life without the possibility of parole. The legal effect of the commutation is that the commuted sentence is treated as though it had been originally imposed, and it has been substituted for the judicially imposed death sentence that had been the focus of the post-conviction court's inquiry. Petitioner's first assignment of error is predicated on a sentence that does not exist and, for all relevant purposes, is deemed never to have existed. Accordingly, even if the post-conviction court erred at the time that it granted relief from the death sentence, petitioner's first assignment of error does not present a basis for reversing that court's ruling.

We emphasize that this resolution of petitioner's first assignment of error is a product of how petitioner pleaded his first claim for post-conviction relief. Unlike his other claims for relief, which essentially challenge the judicial proceeding that led to his death sentence, petitioner's first claim for relief challenges the sentence itself. Petitioner alleges that it violates the constitution for petitioner to be "under a death sentence," and, therefore, that his "death sentence should be vacated." As we have explained, the death sentence that the first claim for relief purports to challenge does not exist. Because of the commutation, any claim challenging the constitutionality of the death sentence *per se* necessarily fails. That is not to say that the commutation in this case precludes other claims for relief that challenge the underlying judicial *proceeding* that ultimately resulted in petitioner's sentence. Petitioner's later claims for relief are of that nature. As we next explain, petitioner is not entitled to relief as to those claims, but for reasons unrelated to the commutation of petitioner's sentence.

Petitioner's remaining assignments of error concern the post-conviction court's resolution of his claims that the "continuing threat" and "deserves death" questions, presented to the jury in his original sentencing proceeding, were unconstitutional. Unlike petitioner's first claim for

post-conviction relief, which challenged the constitutional-ity of a death sentence that subsequently was commuted, the gravamen of his other post-conviction claims is that the jury's consideration of unconstitutional *questions* in deter-mining which sentence to impose (*i.e.*, death, life without parole, or life with the possibility of parole) amounted to a prejudicial penalty-phase error that entitled him to a remand for resentencing. We agree with the parties that, if petitioner is correct that he suffered such a prejudicial error and was entitled to a remand for resentencing, the express terms of the Governor's commutation order do not preclude that result.[7] That is so even though any sentencing proceed-ing would now occur under the provisions of SB 1013 and, at least in the abstract, could result in an even lesser sentence of life with the possibility of parole. Accordingly, we turn to the parties' contentions concerning the penalty-phase questions.

At the outset, we reject the superintendent's argu-ment that we need not consider petitioner's assignments of error concerning those questions because, even if petitioner's claims concerning the constitutionality of the penalty-phase questions had merit, he would not be entitled to a remand for resentencing. Specifically, the superintendent argues that, if petitioner

"were correct that either of the trial jury's 'yes' verdicts on the second and fourth questions must be converted into a 'no' because the question that was answered was 'unconsti-tutional,' that would provide a basis only to invalidate the *death sentence*; but it would not undermine the factual and legal basis for imposition of a true-life sentence instead.

"In other words, once the death sentence is eliminated, the jurors' determination of whether to impose either a true-life sentence or a sentence of life imprisonment with the possibility of parole depends, under ORS 163.150(2), on whether '10 or more members of the jury further find that there are sufficient mitigating circumstances to warrant life imprisonment.' Because the trial jury *unanimously*

---

[7] Because the Governor's commutation order expressly permitted petitioner to "seek[] other or further relief from the courts that [he] may be entitled to," we need not decide, and express no opinion about, the effects of a commutation that lacks such wording.

found that those mitigating circumstances did not warrant a sentence less than death, the jurors' verdict necessarily included within it their determination that fewer than ten of them believed that * * * those mitigating circumstances warranted a sentence less than true life."

(Emphases in original.)

In short, the superintendent contends that, once the death sentence was vacated, the only legally permissible sentence was life without the possibility of parole, because the jury's answers to the penalty-phase questions demonstrated that, as between a sentence of life without parole and life with the possibility of parole, the jury would have chosen the former. But that argument rests on an internal contradiction. The superintendent's position on appeal is predicated on the assumption that the "continuing threat" and "deserves death" questions are *unconstitutional* and, as a result, the jury's unanimous "yes" answers to those questions must be disregarded.[8] But, if that is so, then one cannot simultaneously rely on those same answers—as the superintendent does—to infer that, if the jury had been required to choose between life with parole and "true life," the jury would have chosen the latter. Without those answers, no other basis exists for assuming that the necessary number of jurors would have declined to find sufficient mitigating circumstances to impose a sentence of life with parole.[9] Accordingly, we reject the superintendent's threshold argument and turn to petitioner's remaining assignments of error concerning his claims that the "continuing threat" and "deserves death" questions are unconstitutional.

As we will explain, however, petitioner failed to preserve his second assignment of error challenging the postconviction court's ruling that those claims were procedurally

---

[8] *See* ORS 163.150(1)(e) (providing now, as it did when defendant was convicted and sentenced, that the court shall instruct the jury that it may not answer any of the death penalty questions "yes" unless "it agrees unanimously").

[9] *See* ORS 163.150(2)(a) (providing now, as it did when defendant was convicted and sentenced, that, if the jury answered any of the death-penalty questions in the negative, the trial court was required to sentence the defendant to "life imprisonment without the possibility of release or parole," *unless* "10 or more members of the jury further find that there are sufficient mitigating circumstances to warrant life imprisonment," in which case the trial court is required to sentence the defendant to life imprisonment with the possibility of parole).

barred. Because that failure obviates the need for us to consider petitioner's third and fourth assignments concerning the merits of those claims (*i.e.*, whether each question was unconstitutional), we do not address them further and limit our discussion to petitioner's second assignment.

In that assignment, petitioner contends that the post-conviction court erred in ruling that his claims concerning the "continuing threat" and "deserves death" questions were "untimely" when the state had "conceded otherwise." Petitioner's entire argument in support of that assignment of error in his opening brief is as follows:

> "The [superintendent] could have but did not assert that [petitioner's] petition was untimely. In fact, it expressly conceded timeliness. In any event, the issue was waived.
>
>> "['The state] could have raised the Statute of Limitations as an affirmative defense in an answer or in a motion to dismiss. ORCP 19 B; ORCP 21 A(9). [The state] did neither, and thereby waived that defense. ORCP 21 G(2).
>>
>> "['Allowing [the state] to raise the Statute of Limitations for the first time on appeal would deprive petitioner of any opportunity to present evidence that would show why the petition raises grounds for relief that could not reasonably have been raised in a timely fashion. ORS 138.510(2). [The state] may not do so.[']"
>
> "*Palmer v. State* [*of Oregon*], 121 Or App 377, 380, 854 P2d 955 \*\*\* (1993), *aff'd* [*in part on other grounds*], 318 Or 352, 867 P2d 1368 (1994)."[10]

As we will explain, the fundamental problem for petitioner is that he never raised those bases (*i.e.*, concession and waiver) in the post-conviction court, and they are therefore unpreserved.

"The general requirement that an issue, to be raised and considered on appeal, ordinarily must first be presented to the trial court is well-settled in our jurisprudence." *Peeples v. Lampert*, 345 Or 209, 219, 191 P3d 637 (2008). Among other things, "[p]reservation gives a trial court the chance to consider and rule on a contention, thereby possibly

---

[10] ORCP 21 A(9) is now set out at ORCP 21 A(1)(i), and ORS 138.510(2) is now set out at ORS 138.510(3).

avoiding an error altogether or correcting one already made, which in turn may obviate the need for an appeal," and it "also ensures fairness to an opposing party, by permitting the opposing party to respond to a contention and by otherwise not taking the opposing party by surprise." *Id*. Here, to demonstrate that petitioner failed to preserve his appellate contention that the post-conviction court erred in ruling that his claims concerning the penalty-phase questions were procedurally barred, we describe the pleadings and proceedings before the post-conviction court in some detail.

In his successive petition for post-conviction relief, petitioner conceded that the petition had been "filed more than two years after finality," but he contended that, because it was "premised" on SB 1013, *Bartol*, and *Rogers*, "the grounds for relief *** could not reasonably have been raised previously or in [his] previous [post-conviction] petition." Put simply, petitioner alleged that his claims "were not available previously" and were "timely, not improperly successive, and meritorious pursuant to ORS 138.530(1)(c)," which provides, in part, that post-conviction relief shall be granted when a petitioner establishes the "unconstitutionality of [his] sentence." The superintendent admitted, in his answer, that petitioner's death sentence could not be maintained and that "petitioner could not reasonably have raised the claims *based on SB 1013 and* [*Bartol*] in his previous petition for post-conviction relief and within the time limitation set by ORS 138.510(3)." (Emphasis added.) However, the superintendent "otherwise denie[d]" petitioner's allegation that "the grounds for relief *** could not reasonably have been raised previously or in [his] previous [post-conviction] petition." In other words, as the superintendent explained, he "agreed that petitioner 'could not reasonably have raised' in his previous petition the claims that he alleged in this petition *but only* to the extent that those actually are 'based on SB 1013 and *** *Bartol*.'" (Emphasis in original.)

In moving for summary judgment on the claims concerning the penalty-phase questions, petitioner clarified that, although his arguments drew "support from the legislative changes brought about by SB 1013," his claims were "founded on the contention that both questions were

unconstitutional *at the time of* [*petitioner's*] *trial—before SB 1013 became law.*" (Emphasis added.) Petitioner subsequently filed a memorandum in support of his motion, explaining why, in his view, those penalty-phase questions were unconstitutional.

In his cross-motion, the superintendent asserted that—"[a]s explained in [his] supporting memorandum," which also served as his response to petitioner's summary judgment motion—petitioner's claims concerning the two penalty-phase questions did not provide "any legal basis for [the] court to grant petitioner post-conviction relief." Specifically, in the supporting memorandum, the superintendent argued, among other things, that those two claims were procedurally barred under ORS 138.510(3) and ORS 138.550(3), and, in all events, lacked legal merit. Petitioner did not file a response to the superintendent's cross-motion or seek to file a reply to the superintendent's response to his summary judgment motion, explaining why, in his view, the superintendent had conceded timeliness (or otherwise waived that issue).

At the summary judgment hearing, the parties' arguments focused on whether the post-conviction court had authority to modify petitioner's sentence or whether a remand for resentencing was required. At the conclusion of the hearing, the post-conviction court ruled that the "continuing threat" and "deserves death" questions were "both time-barred and procedurally barred," noting that those questions had been "on numerous occasions challenged at the Oregon Supreme Court and upheld as appropriate," and that petitioner had had "direct appeal, post-conviction relief, and other options to challenge that." Again, petitioner did not alert the post-conviction court that, in his view, the superintendent had conceded timeliness (or otherwise waived that issue).

Following the hearing, the superintendent, as directed, prepared an order and judgment for the post-conviction court's signature; however, the parties disagreed about the court's ruling as to the claims concerning the penalty-phase questions. In a letter to the court, the superintendent explained, "Petitioner's counsel has informed me

that he believes [the court] ruled that [those claims] have no merit. My recollection of the ruling is that those claims are procedurally barred. Because of counsels' disagreement as to your ruling, I have prepared two different orders." Even at that point, petitioner did not seek to alert the post-conviction court to the contentions that he now raises on appeal.

Ultimately, the post-conviction court issued an order providing that the superintendent was entitled to summary judgment on petitioner's second and third claims for relief, explaining, as it had at the conclusion of the hearing, that those claims were "procedurally barred by ORS 138.510(3) and ORS 138.550(3)." *See* ORS 138.510(3) (generally precluding untimely petitions); ORS 138.550(3) (generally precluding improperly successive petitions).

In sum, petitioner's successive petition included an allegation that his claims could not reasonably have been raised earlier. Thereafter, the superintendent disputed that assertion, yet petitioner did nothing to alert the post-conviction court to his view that the superintendent nonetheless had somehow "waived" or "conceded" that issue, as petitioner now asserts. On review, in contending that the post-conviction court erred, petitioner relies on the superintendent's concession that petitioner's claims were timely *to the extent that* they were based on SB 1013 and *Bartol*, and on his related assertion that the claims could not "be subject to *any procedural bar*" because SB 1013's elimination of the "continuing threat" question and its imposition of a "beyond a reasonable doubt" standard on the "deserves death" question demonstrate that both questions are unconstitutional as measured by evolving standards of decency and events that occurred *after* petitioner's trial, direct appeal, and prior post-conviction proceeding. (Emphasis added.) But that argument disregards the fact that the superintendent expressly argued to the post-conviction court that petitioner's claims *could have been raised* even before SB 1013 and *Bartol*, and that the procedural bars therefore applied. In light of those arguments, it was incumbent on petitioner to inform the post-conviction court of his position that the

superintendent had conceded timeliness or, in all events, had waived the issue. He did not do so.

Accordingly, petitioner did not preserve his challenge to the post-conviction court's ruling that his claims for relief concerning the penalty-phase questions were procedurally barred under ORS 138.510(3) and ORS 138.550(3).

## III.   CONCLUSION

After the post-conviction court entered its judgment resolving petitioner's first claim for post-conviction relief by vacating his death sentence and modifying the sentence to life without the possibility of parole instead of remanding for resentencing, the Governor stepped in and commuted petitioner's death sentence to a sentence of life without the possibility of parole. As we have explained, even if the post-conviction court erred at the time that it made its ruling, petitioner is not entitled to the relief that he requests on appeal (*i.e.*, a reversal of the post-conviction court's judgment and a remand for resentencing). That is so because the Governor's commuted sentence became the operative sentence, as though it had been the sentence originally imposed, and, as a result, petitioner is not entitled to relief concerning the judicially imposed sentence that had been the focus of the post-conviction court's inquiry. In addition, petitioner failed to preserve his challenge to the post-conviction court's ruling that his claims concerning two of the penalty-phase questions were procedurally barred. Accordingly, we affirm.

The judgment of the post-conviction court is affirmed.