No. 203 March 12, 2025 597

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

TARA ELLYSSIA ZYST,
*Petitioner-Appellant,*

*v.*

Brandon KELLY,
Superintendent,

Oregon State Penitentiary,
*Defendant-Respondent.*
Marion County Circuit Court
02C15732; A164370

Don A. Dickey, Judge.

Argued October 25, 2023.

Daniel J. Casey argued the cause for appellant. Also on the briefs was Lindsey Burrows. Tara Zyst filed the supplemental brief *pro se*. Lindsey Burrows and O'Connor Weber LLC filed the supplemental brief for appellant.

Ryan P. Kahn, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, David B. Thompson, Assistant Attorney General, and Philip M. Thoennes, Assistant Attorney General.

Before Shorr, Presiding Judge, Pagán, Judge, and Mooney, Senior Judge.

SHORR, P. J.

Affirmed.

**SHORR, P. J.**

Petitioner appeals a judgment denying her[1] petition for post-conviction relief. As relevant to this appeal, that petition largely focused on allegations that her defense team performed deficiently throughout every stage of her prosecution and the appeal that followed. In the criminal proceeding, petitioner was convicted of two counts of aggravated murder for the killing of two victims who were camping with petitioner on the bank of the Willamette River. Early in the investigation, police suspected that petitioner was responsible for the killings. Police then arrested petitioner, and she was indicted for the crimes. A jury ultimately convicted petitioner and sentenced her to death for both murders. On direct review of the criminal judgment that imposed the death penalty, the Oregon Supreme Court affirmed the convictions and sentences of death. *State v. Terry*, 333 Or 163, 165, 172, 37 P3d 157 (2001), *cert den*, 536 US 910 (2002). Petitioner then filed her petition for post-conviction relief, which the post-conviction court—in a 288-page opinion—denied after trial. In this appeal of the post-conviction court's judgment, she assigns error to that court's denial of her claims and to the exclusion of several exhibits that she sought to introduce at the post-conviction trial. As we will explain, none of petitioner's arguments provide a basis for reversing the post-conviction court's judgment. Accordingly, we affirm.

## I.   PRELIMINARY MATTERS

At the outset, we note that we will not address at length many of petitioner's arguments because they are either moot, contrary to controlling case law, or undeveloped. We will first address the issues that are moot and controlled by existing case law and briefly discuss the nature of many of the undeveloped arguments. Then we will turn to an extended discussion of the remaining arguments.

The moot issues arise in petitioner's fourth and eighth assignments of error, in which she argues that trial

---

[1] Petitioner is a transgender woman who uses feminine pronouns. She transitioned during the pendency of this appeal. To recognize that transition, this opinion refers to petitioner with feminine pronouns except when citing prior cases involving her.

counsel wrongly failed to challenge the constitutionality of Oregon's death-penalty scheme. Former Governor Kate Brown commuted petitioner's death sentence to a sentence of life without the possibility of parole.[2] "[T]he legal effect of the commutation is that the sentence of life without the possibility of parole stands as if it had been originally imposed." *Thompson v. Fhuere*, 372 Or 81, 97, 545 P3d 1233 (2024). That means petitioner's death sentence no longer exists. *Id.* at 97-99. Thus, we reject as moot any arguments that would provide as a remedy only the reduction of petitioner's death sentence to a sentence of life without the possibility of parole. The remainder of petitioner's sentencing-related arguments (*i.e.*, those that would have as a remedy a new penalty-phase proceeding) are addressed below. *See id.* at 99 (explaining that the commutation of the petitioner's death sentence did not "preclude[] other claims for relief that challenge the underlying judicial proceedings that ultimately resulted in petitioner's [death] sentence").

The arguments contrary to controlling case law arise in petitioner's ninth and tenth assignments of error, in which she argues that the post-conviction court erred in denying her claims of cumulative error, and in her twelfth assignment of error, in which she argues that we should overrule *Palmer v. State of Oregon*, 318 Or 352, 867 P2d 1368 (1994). With respect to the former, we have held that cumulative error is not recognized in Oregon, and so we affirm the post-conviction court on that point. *Vega-Arrieta v. Blewett*, 331 Or App 416, 428, 545 P3d 746, *rev den*, 372 Or 763 (2024); *Manning v. Kelly*, 325 Or App 31, 36, 528 P3d 311 (2023). With respect to the latter, petitioner recognizes

---

[2] The parties do not dispute the fact that petitioner's sentence of death was commuted. However, petitioner has filed a successive petition for post-conviction relief challenging the legality of the governor's commutation. *Tara Zyst v. Brandon Kelly*, Marion County Case No. 21CV39651.

Nevertheless, petitioner does not argue that that pending case has any impact on the issue of mootness in this one. *Cf. State v. Walraven*, 282 Or App 649, 654, 385 P3d 1178 (2016) (explaining that "speculative or merely possible" effect of this court's decision is not sufficient to avoid mootness (internal quotation marks omitted)). Neither does petitioner contend that the moot issue should otherwise be considered by us under ORS 14.175 or that her original death sentence itself has any ongoing collateral effect on her. But, even assuming for the sake of argument that the arguments were not moot, we would reject them as inadequately developed.

that we are bound by *Palmer* but "raises [the challenge] for purposes of preserving it for review by the Oregon Supreme Court, and exhausting it for a possible habeas corpus action in federal court." Because we are bound by the Supreme Court's case law, we reject petitioner's argument.

Turning to petitioner's many undeveloped arguments, we first note that most of petitioner's assignments of error do not comply with ORAP 5.45(3) and (4). That is, they do not separately identify and address the specific ruling of the post-conviction court that is being challenged and fail to specifically identify error in the post-conviction court's ruling, which complicates our ability to analyze the arguments she raises. Nevertheless, we have attempted to carefully consider each and every one of petitioner's arguments. Often, the arguments simply assert that her counsel rendered deficient performance while ignoring the post-conviction court's ruling entirely, disregarding the standard of review, and framing the issues as if we were exercising *de novo* review. We reject such arguments as undeveloped. *See, e.g.*, *Waldorf v. Premo*, 301 Or App 572, 457 P3d 298 (2019), *rev den*, 366 Or 451 (2020) (not addressing undeveloped argument); *Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 701 n 2, 64 P3d 1193, *adh'd to as clarified*, 187 Or App 472 (2003) (declining to address "conclusory sentences" requesting a remand and new trial); ORAP 5.45(3) ("Each assignment of error must identify precisely the legal, procedural, factual, or other ruling that is being challenged.").

Finally, we have thoroughly evaluated every argument that we could identify in petitioner's briefing. To the extent that any argument is not explicitly addressed below (including those raised in petitioner's *pro se* supplemental brief), we reject them without further discussion.

Having addressed those preliminary issues, we will address petitioner's challenge to the post-conviction court's exclusion of several exhibits. Then we will address the remainder of petitioner's arguments by sorting them into the stages of the criminal case they pertain to (*i.e.*, pretrial, guilt phase of the trial, penalty phase of the trial, and direct appeal).

## II.   EVIDENTIARY ISSUES

In petitioner's eleventh assignment of error, she challenges the exclusion of various exhibits that she sought to admit at the post-conviction trial. As we will explain, the post-conviction court did not err in excluding the exhibits at issue, and so we also necessarily reject those arguments that are premised upon the admissibility of those exhibits.

A.   *Exhibit 70: Declaration of Dr. Richard Ofshe*

Petitioner sought to introduce as expert testimony Exhibit 70, the declaration of Dr. Ofshe, a purported expert in and researcher of police interrogation techniques, false confessions, and "cult activities." Petitioner offered Ofshe's declaration to support her argument that trial counsel should have retained him to determine whether police officers used coercive tactics to elicit a false confession from her. The post-conviction court excluded the declaration in an email order on the grounds that (1) it did not have attached his "CV and other attachments to evaluate expertise," and (2) it did not state "what his opinion would have been had he testified" nor did Ofshe provide "any testimony he would have given then."

On appeal, petitioner defends Ofshe's qualifications as an expert and contends that the summaries of the articles he included in his declaration are sufficient to assess their substance. Petitioner does not, however, challenge the court's additional basis for excluding the exhibit: that the declaration did not include any opinion or testimony that Ofshe would have provided had he been called to testify. The post-conviction court's unchallenged ruling provides a basis for affirmance. *Austin v. Premo*, 280 Or App 481, 486-87, 380 P3d 1253, *rev den*, 360 Or 697 (2016) ("[T]he unchallenged, independent, and adequate basis for the court's decision generally will require affirmance, regardless of the merits of the legal challenge to the other basis for decision."); *Roop v. Parker Northwest Paving, Co.*, 194 Or App 219, 236, 94 P3d 885 (2004) (trial court's ruling must be affirmed when a party "fail[s] to challenge the alternative basis of the trial court's ruling"). Without any statement from Ofshe as to the contents of his testimony, petitioner

cannot carry her burden of production to show that Ofshe "would have provided testimony likely to have changed the result of the [post-conviction] trial." *Hale v. Belleque*, 255 Or App 653, 681, 298 P3d 596, *adh'd to on recons*, 258 Or App 587, 312 P3d 533, *rev den*, 354 Or 597 (2013).

B.  *Exhibit 26: Report of FBI Agent James Trainum*

Petitioner sought to introduce Exhibit 26, a report from FBI agent James Trainum, a purported expert in false confessions. Trainum opined in his report that police officers may have used improper interrogation tactics to elicit a false confession from petitioner. The post-conviction court excluded the exhibit on the ground that Trainum did not aver in his report that he would have been available to testify in petitioner's criminal trial and because the report was not sworn. The court, however, received the exhibit only as an offer of proof at petitioner's request.

The post-conviction court did not err in excluding Exhibit 26 as evidence because Trainum did not aver that he would have been available to testify to the contents of his report at the time of petitioner's criminal trial. In order for Trainum's report to have been relevant to petitioner's contentions that police elicited a false confession from her, petitioner needed to show that "the witness would have been available to testify * * * at the time of trial." *Hale*, 255 Or App at 681. Nowhere in his report did Trainum ever state that he would have been available to testify at petitioner's criminal trial on the subject of false confessions. The post-conviction court did not err in excluding Exhibit 26.

C.  *Exhibit 25: Declaration of Joseph Laycock*

Petitioner sought to introduce Exhibit 25, the declaration of Dr. Joseph Laycock, a professor of religious studies, which included a discussion about satanism and the occult. It appears that petitioner sought to introduce Laycock's report to show that her trial counsel should have presented expert testimony to demonstrate that the "satanism" referred to throughout petitioner's case "is an imaginary religion that does not exist," that petitioner's writings were not satanic in nature, and to explain the true nature of the writings as artistic expression.

The post-conviction court excluded that exhibit on the ground that Laycock's declaration did not include a "statement that the witness was available to testify at the original trial." The court did not err in doing so, because as noted, petitioner must demonstrate that "the witness would have been available to testify *** at the time of trial," *Hale*, 255 Or App at 681, and she failed to do so.

D.  *Exhibit 104: Spreadsheet of Counsel Dane's Cases in Washington State*

During the deposition of trial counsel Irving Dane, petitioner sought to introduce Exhibit 104, a spreadsheet listing Dane's active cases in Washington state court at the time he was working on petitioner's case. It appears that petitioner offered that exhibit to show that Dane was too busy with other criminal cases, including a first-degree murder case, to have adequately represented petitioner in the criminal trial.

The spreadsheet was never marked as an exhibit to Dane's deposition, and so it was not made part of the record before the court's discovery deadline. When petitioner realized the oversight and brought it to the court's attention, the court posited, and petitioner agreed, that the same information from the spreadsheet could be introduced through witness testimony. The court excluded the spreadsheet on timeliness grounds.

On appeal, petitioner argues that the post-conviction court abused its discretion and violated her federal constitutional rights in excluding the spreadsheet. Those arguments are unpreserved because petitioner did not argue to the court that the exclusion of the spreadsheet on timeliness grounds was legally improper or a violation of her federal constitutional rights. In any event, the court had the discretion to enforce its deadlines. *Weaver v. Highberger*, 334 Or App 96, 101, 555 P3d 315, *rev den*, 373 Or 119 (2024) (citing *State v. Rogers*, 330 Or 282, 300, 4 P3d 1261 (2000)). And, although the court allowed petitioner to have introduced the same information from the spreadsheet through other witness testimony, she did not attempt to do so. Thus, we affirm the court's exclusion of the spreadsheet.

E.  *Exhibits 31 and 32: Excerpts of the US Department of Justice's Forensic Serology Book and an Article About Presumptive Blood Tests*

Petitioner sought to introduce Exhibits 31 and 32 in the post-conviction court. Exhibit 31 is a sourcebook from the United States Department of Justice regarding presumptive blood tests, and Exhibit 32 is a journal article about presumptive blood tests. Petitioner sought to introduce these exhibits to support an argument now at issue in her sixth assignment of error, in which she contends that her defense counsel performed deficiently by not educating themselves on the problems with presumptive blood tests and raising challenges to the state's evidence on that basis.

The post-conviction court held a pretrial hearing on the superintendent's motion *in limine* to exclude those exhibits. The court did not issue a final ruling on the admissibility of the exhibits at that hearing and stated that it was open to receiving them at a later time if petitioner made a case for them:

> "What I'm going to do right now is just deny a lot of the [superintendent's objections]. So I'm going to reject or not receive [Exhibits] 31 and 32, and if [petitioner] really want[s] those in, [she] might be able to convince me."

The court's statements, although a bit confusing, show that, at a minimum, the court did not issue a final ruling on the admissibility of the exhibits at that hearing. Rather, the court allowed for the possibility that petitioner would offer the exhibits at a later time and afford the court the opportunity to issue a final ruling. Petitioner never did so. The court's statements demonstrate that, at most, it engaged in a merely preliminary discussion on the admissibility of Exhibits 31 and 32, which was not a final ruling and cannot be challenged. *See State v. Brown*, 300 Or App 192, 199, 452 P3d 482 (2019), *rev'd on other grounds*, 367 Or 220 (2020) ("[A] party may not assign error to a preliminary evidentiary ruling."); *State v. Johnson*, 315 Or App 66, 496 P3d 1075 (2021) (so holding).

Given that the post-conviction court did not err in excluding Exhibits 31 and 32, petitioner's reliance on those

exhibits for her argument that her counsel should have challenged, based on information in the exhibits, the "presumptive blood tests" used by the state lab to test blood stains on petitioner's jacket renders that argument unavailing.

F.   *Exhibit 83: Petitioner's Psychiatric Evaluation Conducted by Dr. Soroush Mohandessi*

Petitioner sought to introduce Exhibit 83, the report of Dr. Soroush Mohandessi. Mohandessi evaluated petitioner in 2010, while she was incarcerated, to support a medical habeas case. Mohandessi opined that petitioner had schizoaffective disorder of the bipolar type as of 2010. Petitioner wanted the report in the post-conviction record to show that her trial counsel "should have helped [her] convince Clackamas County jail to put her on a proper medication," which in her view, "may have aided in the relationship between [her and] counsel."

The post-conviction court excluded the report because it determined that it was not relevant given (1) that the report was offered for, but did not provide, "an opinion about [the] relationship" between counsel and petitioner and (2) that the report did not contain Mohandessi's opinion on petitioner's mental state during defense counsel's representation of her.

The court did not err. The report provided an opinion about petitioner's mental state at the time of the evaluation in 2010—15 years after petitioner's criminal trial. Although Mohandessi looked at petitioner's mental condition in 1994 and 1995, when the murders and petitioner's trial occurred, he did not provide an opinion on that time frame, and so petitioner did not show that Mohandessi "would have provided testimony likely to have changed the result of the trial." *Hale*, 225 Or App at 681.

G.   *Exhibit 54: Articles from* The Oregonian

Petitioner sought to introduce Exhibit 54, a combination of several articles published in *The Oregonian* about the murder convictions of Laverne Pavlinac and John Sosnovske. According to the articles, those convictions resulted from false confessions that were elicited by Detective Corson of

the Oregon State Police—the same detective who obtained petitioner's confession.

Before the post-conviction court, the superintendent moved to exclude the exhibit on relevance and hearsay grounds. In response, petitioner argued that the exhibit was relevant because, had trial counsel "had more information about Corson's methodology," they "may have been able to present a better argument at the hearing on petitioner's motion to suppress her confession." However, petitioner acknowledged that she was not certain whether or not trial counsel was aware of the information contained in Exhibit 54 during the relevant time period. The post-conviction court excluded the exhibit because it determined that the exhibit was not relevant and reasoned that the articles would not be helpful to its determination of counsel's performance.

On appeal, petitioner challenges that ruling, arguing that the articles were relevant to establish "information that was available to trial counsel and thus probative of their state of mind." In turn, petitioner argues that, had trial counsel had that information, trial counsel (1) would have been better able to respond to the state's objection to questions about prior false confessions during Corson's cross-examination and (2) would have been able to make better arguments to the jury about Corson's pattern of eliciting false confessions. Again, petitioner points to no evidence in the record to establish whether or not trial counsel was aware of the information contained in the exhibit.

We reject petitioner's arguments as unpreserved. Below, petitioner's theory of relevance was that the information in Exhibit 54 may have aided trial counsel in litigating a motion to suppress petitioner's statements, but petitioner has seemingly abandoned that argument on appeal and instead focuses on theories of relevance related to trial counsel's performance during the guilt phase of trial.

Even if we were to reach the issue on the merits, however, petitioner has failed to establish error. At best, the exhibit was *conditionally* relevant depending on whether trial counsel had knowledge of the facts contained therein (with the actual relevance of the exhibit changing depending on the

nature of trial counsel's knowledge). But petitioner acknowledged below that there was no evidence to establish whether trial counsel had knowledge of the facts or not; thus, that condition is left unfulfilled, rendering the exhibit irrelevant. *See* OEC 104(2) ("When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."). Thus, the post-conviction court did not err in excluding Exhibit 54.[3]

### III.   CLAIMS OF INADEQUATE AND INEFFECTIVE ASSISTANCE OF COUNSEL

We proceed to the arguments concerning petitioner's claims of inadequate assistance of counsel. The underlying facts of the crime and investigation are extensive and have been thoroughly recounted by the Supreme Court. *See Terry*, 333 Or at 165-70. We do not repeat them in full here, opting instead for a short overview. We will include additional facts below, as they become relevant to our discussion regarding specific arguments.

In August 1994, two brothers were found dead at a campsite beside the Willamette River near downtown Milwaukie in Clackamas County. *Terry*, 333 Or at 166. The victims had been stabbed multiple times. *Id.* 184-85. Petitioner, a close friend of one of the victims, became a person of interest and, after an investigation, was arrested and charged for the murder of the two victims. *Id.* at 168-70. The court appointed a team of two attorneys to represent petitioner at trial. Although the same second-chair attorney represented petitioner throughout the case, petitioner had three different lead attorneys.[4] A jury ultimately convicted petitioner of two counts of aggravated murder and sentenced her to death in November 1995. *Id.* at 170. Petitioner sought automatic review of her conviction and sentence, the Supreme Court affirmed, and the United States Supreme Court denied review.

---

[3] Given that the post-conviction court did not err in excluding Exhibit 54, we necessarily reject petitioner's arguments that rely on the admission of that exhibit in her fourth and seventh assignments of error.

[4] Unless otherwise noted, we do not explicitly differentiate amongst the attorneys, referring instead simply to "trial counsel."

Years later, in this case, petitioner sought post-conviction relief from her convictions. Among other things, she asserted that her trial and appellate counsel provided inadequate and ineffective assistance in hundreds of ways. The post-conviction court struck many of those claims on summary judgment. And it ultimately denied relief in a 288-page opinion following a trial on petitioner's remaining claims.

On appeal, petitioner challenges the denial of several of her claims for relief. As we mentioned above, we will address those arguments by moving through each stage of her criminal case. But we begin by summarizing the legal standards broadly applicable to all of petitioner's claims of inadequate and ineffective assistance of trial counsel.

Petitioner asserts parallel claims of inadequate and ineffective assistance of trial counsel under Article I, section 11, of the Oregon Constitution and the Sixth and Fourteenth Amendments to the United States Constitution. The legal standards to obtain relief under both constitutions are "functionally equivalent": (1) a petitioner must show that her trial counsel failed to exercise reasonable professional skill and judgment, and (2) a petitioner must show that she suffered prejudice as a result of counsel's inadequacy. *Montez v. Czerniak*, 355 Or 1, 6-7, 322 P3d 487, *adh'd to as modified on recons*, 355 Or 598, 330 P3d 595 (2014); *Perkins v. Fhuere*, 332 Or App 290, 292-93, 549 P3d 25 (2024).

In assessing the first prong (*i.e.*, the "performance" prong), a court "must make every effort to evaluate a lawyer's conduct from the lawyer's perspective at the time [of the trial or hearing], without the distorting effects of hindsight." *Lichau v. Baldwin*, 333 Or 350, 360, 39 P3d 851 (2002). In cases alleging a failure to investigate or that such investigation was inadequate, tactical decisions "must be based on 'a reasonable investigation,'" unless counsel has a reason to think that an investigation would be "fruitless or even harmful." *Richardson v. Belleque*, 362 Or 236, 256, 406 P3d 1074 (2017) (quoting *Johnson v. Premo*, 361 Or 688, 703, 709, 399 P3d 431 (2017)). "[E]ach decision to limit investigation *** must be a reasonable exercise of professional skill and judgment under the circumstances." *Id.* (quoting *Lichau*,

333 Or at 360). Nonetheless, in the context of a mitigation investigation, counsel need not investigate "every shred of evidence regarding petitioner's background, psychological makeup, or other factors that the jury might possibly have found to be mitigating." *Montez*, 355 Or at 16.

In assessing the prejudice prong, a court must determine whether there was more than a mere possibility that the outcome of the criminal trial could have been different if counsel's performance was not deficient. *Green v. Franke*, 357 Or 301, 322, 350 P3d 188 (2015). Where, as here, a petitioner asserts that trial counsel failed to conduct a reasonable investigation, the petitioner carries the burden to "adduce evidence at the post-conviction hearing that would have been discovered and introduced at the criminal trial had trial counsel undertaken the proposed investigation." *Short v. Hill*, 195 Or App 723, 729, 99 P3d 311 (2004), *rev den*, 338 Or 374 (2005); *Jenkins v. Cain*, 310 Or App 608, 614, 487 P3d 433 (2021). With regard to mitigation evidence, a court must assess "whether 'there was more than a mere possibility' that an adequate investigation would have yielded information that could have been used at the sentencing hearing in a way that gave rise to 'more than a mere possibility' that the outcome of the proceeding could have been different." *Monfore v. Persson*, 296 Or App 625, 636, 439 P3d 519 (2019) (quoting *Richardson*, 362 Or at 266-68).

We review a post-conviction court's judgment for legal error, accepting the court's implicit and explicit findings of fact. *Green*, 357 Or at 312. If the post-conviction court did not make findings of fact on an issue, and there is evidence from which such facts could be decided more than one way, we presume that the court made any necessary factual findings in a manner consistent with its legal conclusions. *Id*. As for the issues decided by the post-conviction court on summary judgment, we review the grant of summary judgment "to determine whether the court correctly concluded that there are no genuine issues of material fact and that [the superintendent] was entitled to judgment as a matter of law." *Putnam v. Angelozzi*, 278 Or App 384, 388, 374 P3d 994 (2016). With those standards in mind, we proceed to the arguments before us.

A.   *Pretrial Phase*

We begin by addressing petitioner's arguments that the post-conviction court erred in denying relief on claims asserting that her trial counsel performed deficiently before trial. In her first, third, fourth, and twelfth assignments of error, petitioner contends that her counsel were inadequate and ineffective in numerous ways.

1.   *Qualification and succession of trial counsel*

In her first and twelfth assignment of error, petitioner asserts that her trial counsel did not meet Oregon's then-existing standards for court-appointed counsel, and she argues that the succession of multiple lead attorneys on her case compromised the effectiveness of her representation overall. The post-conviction court granted the superintendent's motion for summary judgment on those claims and denied relief on closely related arguments after trial. The PCR court appears to have relied on two alternative grounds for doing so: (1) that the claims were barred by *Palmer* because petitioner could have raised those arguments at trial or on direct appeal and (2) that petitioner failed to establish that the alleged lack of qualifications and succession of lawyers actually resulted in her defense team rendering inadequate and ineffective assistance of counsel.

On appeal, insofar as the PCR court granted summary judgment on the claims, petitioner does not dispute that there were no issues of material fact with regard to those arguments. Instead, she argues first that, under *Hicks v. Oklahoma*, 447 US 343, 100 S Ct 2227, 65 L Ed 2d 175 (1980), and *United States v. Cronic*, 466 US 648, 104 S Ct 2039, 80 L Ed 2d 657 (1984), Oregon's failure to comply with its own qualification standards amounted to due process violations and that her attorneys' lack of qualification amounted to violation of her right to counsel even without a showing of prejudice.[5] Second, she argues that the succession of counsel compromised the constitutional adequacy of her representation.

_____

[5] We note that, unlike nearly all of the arguments that follow, petitioner's arguments under *Hicks* and *Cronic* are not standard inadequate-assistance-of-counsel claims; rather, they are claims that petitioner was denied due process and deprived of her right to counsel.

Even assuming that it erred in holding that the claims were barred by *Palmer*, we are not persuaded that the post-conviction court erred in granting summary judgment. First, neither *Hicks* nor *Cronic* are implicated here. In *Hicks*, the Court recognized that, where a state creates a legal procedure, it can be a federal due-process violation to arbitrarily deprive a criminal defendant of the protections of that procedure. 447 US at 346. However, petitioner presented no evidence that she was arbitrarily deprived of any state-sanctioned *procedure* to ensure she had qualified counsel, she simply argues that—in her view—her counsel did not meet Oregon's standards.

In *Cronic*, the Court recognized that the denial of the right to effective assistance of counsel can merit relief without a specific showing of prejudice in two situations: (1) when there is a complete denial of counsel or the surrounding circumstances of a trial were such that no attorney could provide adequate assistance of counsel, or (2) when the attorney "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." 466 US at 659-61. It is a petitioner's burden to prove that one of those standards is met. *Id.* at 658. If they fail to do so, the petitioner must resort to litigating claims of ineffective assistance, which requires pointing out specific errors made by trial counsel. *Id.* at 666.

Here, petitioner's argument about the failure to satisfy Oregon's qualification requirements does not meet either of the situations discussed in *Cronic*. First, she was represented by counsel and is not arguing that *no* attorney could provide adequate assistance in the circumstances. Second, she has not made a colorable showing that her attorneys failed to subject the state's case to any meaningful adversarial testing. Absent the showings required by *Hicks* and *Cronic*, petitioner cannot obtain post-conviction relief solely based on the qualifications of her attorneys or on the succession of attorneys in her case. *See State v. Maletta*, 98 Or App 643, 650, 781 P2d 350 (1989), *rev den*, 309 Or 522 (1990) (The "adequacy of counsel is measured by performance, not credentials."). Thus, the post-conviction court did not err

in granting summary judgment to the superintendent and denying relief on this claim.

2. *Client care and trust building*

In her first assignment of error, petitioner also argues that trial counsel were constitutionally inadequate because they (1) failed to obtain adequate psychiatric support for petitioner, (2) failed to spend sufficient time with her, (3) failed to address problems that arose in pretrial custody, and (4) failed to assemble and manage an adequate defense team.

a. Failure to provide adequate psychiatric support

We understand petitioner to argue that (1) she had a constitutional right to "participate meaningfully" in her own defense, and (2) that trial counsel rendered constitutionally deficient performance by failing to provide the psychiatric and medical support needed to stabilize petitioner enough for her to do so. Petitioner appears to argue that trial counsel should have retained a mental-health provider to treat her and to prescribe her medication.

The post-conviction court found as a factual matter that trial counsel "promptly sought psychiatric medical assistance" from Dr. Cooley and that, whenever counsel suggested mental health "evaluations" or "examinations," petitioner refused to cooperate and "the door came down." Therefore, it concluded that petitioner failed to establish inadequacy or prejudice.

Petitioner argues that the court's factual findings were unsupported by the record. Yet she acknowledges that there is evidence in the record that Cooley "attempted to" help "stabiliz[e]" petitioner and that trial counsel sought an aid-and-assist determination. And she acknowledges that "[n]umerous *** members of the defense team similarly described petitioner's refusal to explore or even discuss her mental health[.]" To the extent that petitioner is arguing that trial counsel should have done more to ensure that petitioner received adequate medication while in custody, she fails to point to evidence in the record either that counsel would have had any ability to get medication prescribed

and administered to her or that medication would have been effective at that time. In light of the evidence in the record supporting the post-conviction court's ruling and the lack of sufficient evidence of prejudice, we are not convinced that the court erred in rejecting the claim.

### b.   Failure to spend sufficient time with petitioner

Next, petitioner argues that trial counsel was deficient for failing to have sufficient face-to-face meetings with her. She argues that such meetings are necessary to build trust and confidence between an attorney and client. Additionally, she argues that the three changes in lead counsel undermined her ability to develop rapport and trust with her attorneys.

Yet petitioner's arguments focus only on the first seven months of her case, and she argues that visits by investigators did not count because "such contacts could hardly have fostered petitioner's trust." She also acknowledges that she had the same second-chair attorney throughout the life of her case, but she argues that he "spent little time in the first months of his representation, either meeting with petitioner or establishing a trusting relationship."

The post-conviction court rejected this claim, finding that trial counsel "met with [p]etitioner regularly and communicated in writing." Further, to the extent that petitioner focused on early failures to spend enough time with her, the court found that such failings could be "repaired by later [counsel]." The court explained:

> "For example, if an early [attorney] was arguabl[y] inadequate in some particular, a subsequent [attorney] could cure that failure. Thus, it is possible that a failure by attorney 1 is remedied by the work of attorney 3 or 4, in which case review of the earlier counsel's representation becomes irrelevant or does not result in harm."

Furthermore, the court found that both of the attorneys that represented petitioner at her actual trial "had a good relationship with [p]etitioner."

We can find no error in the post-conviction court's ruling. Petitioner's argument appears to be simply that she

had a constitutional right to adequate contact *throughout* the life of her case, which is no doubt true. But that argument fails to account for her burden to establish prejudice. And she does not specify, in any concrete way, how she was prejudiced by any early deficiencies building trust and rapport.

    c.   Failure to address pretrial custody problems

Petitioner asserts that trial counsel "deficiently failed to advise petitioner and guide her conduct in custody regarding correctional officers, inmates, and other government agents, and failed to advocate for her on those issues." She raises four specific arguments, which we address in turn.

First, petitioner argues that trial counsel failed to adequately prepare her for her aid-and-assist evaluation with court-appointed expert Dr. Hulteng. But her argument relies on her own testimony that they failed to render adequate advice and on an absence of billing records showing that trial counsel met with her near in time to the evaluation. However, she acknowledges evidence in the record that one of her trial counsel "testified that his standard practice was to meet with clients before an aid-an-assist psychological evaluation, to give them an idea of what was happening and why, to talk about the process, and to make sure they understood their rights."

We conclude that there was no error. In short, the post-conviction court was not required to credit petitioner's testimony and the lack of billing records is not incontrovertible proof that counsel failed to advise her properly. Nor does petitioner point to evidence in the record to establish prejudice. She asserts that she made "damaging statements" during the interview, but she fails to identify any evidence to suggest that she would not have done so if she had been properly advised.

Second, petitioner argues that trial counsel failed to adequately advise her about how she should act while in custody. But the only evidence she appears to rely on to establish that failure is her own ill-advised conduct while in jail. The post-conviction court could properly find that petitioner failed to establish deficient performance.

Third, petitioner argues that trial counsel "failed to advocate with corrections staff to secure petitioner's right to contact counsel in jail, protect her from harassing behavior by correctional staff, and otherwise help meet her needs in custody." In summary, petitioner recounts disturbing and abusive conduct perpetrated by a cellmate and jail staff, and she asserts that counsel were aware of that conduct and she believed that counsel failed to follow up. But the only evidence that she points to is her own testimony that she "told [her] attorneys about [her] treatment" and that she "[did] not believe they tried to talk to the jail staff." She argues that, because her trial counsel did not affirmatively contradict that testimony, there was sufficient evidence of a failure to act. We disagree, the post-conviction court was not required to credit petitioner's testimony and, therefore, the post-conviction court could properly find that petitioner failed to establish deficient performance.

Finally, petitioner argues that trial counsel failed to make sure that she was fed lunch during the first few days of trial, "which caused her to be hungry, irritable, and unable to focus and assist in her defense." But petitioner herself testified that "jail staff were not giving her lunch the first few days of trial, and it was only when she told [her attorney], or [her attorney] noticed, that the defense team arranged to have fast food such as pizza or a 'hoagie' sandwich provided." Thus, even according to petitioner, her counsel addressed the problem as soon as they were aware of it. The post-conviction court could properly find that petitioner failed to establish deficient performance.

### d.  Failure to assemble and manage adequate defense team

Petitioner argues that trial counsel failed to exercise adequate oversight over the defense team, failed to give adequate direction to investigators, and failed to hire qualified investigators. However, as explained with regard to petitioner's arguments about the qualification of counsel, the operative question is whether the actual *performance* rendered by the defense team was constitutionally inadequate and prejudicial. Here, to prove deficient performance and prejudice, petitioner asks us to consider her other

claims, but she does not make an independent argument of prejudice. Because we find no error in the remainder of the post-conviction court's rulings, we likewise find no error in rejecting this argument for lack of prejudice.

3.   Brady *material*

In the fifth assignment of error, petitioner contends that her trial counsel rendered deficient performance by (1) failing to request *Brady* materials[6] except by way of a generic motion, (2) failing to object to the trial court's ruling that the prosecution was required to turn over only favorable evidence in the prosecutor's possession, (3) failing to object when a prosecutor said it would only turn over information about testifying witnesses, and (4) failing to litigate the state's destruction of DNA-testing swabs, which petitioner claims would have been helpful to her defense. The post-conviction court denied those claims for relief.

First, with regard to the *Brady* motion, the court found that trial counsel did request all *Brady* material and that the trial court granted the motion (with some exceptions). The post-conviction court added that petitioner did not identify any *Brady* material that was withheld and that would have been helpful.

The court did not err. The post-conviction court's factual findings are binding on us if there is evidence in the record to support them. *Green*, 357 Or at 312. Here, the record supports the court's finding that defense counsel presented an adequate *Brady* motion. Petitioner faults her counsel for not being more specific in their *Brady* request, but there was no need to be. The state acknowledged its obligation to turn over exculpatory and favorable evidence to petitioner, and the criminal court ordered the state to comply with its obligation. Whether or not the state fully complied with its obligation is another question entirely and does not turn on the adequacy of trial counsel's initial *Brady* request.

---

[6] *"Brady"* refers to the seminal case, *Brady v. Maryland*, 373 US 83, 87, 83 S Ct 1194, 10 L Ed 2d 215 (1963), in which the United State Supreme Court prescribed the prosecution's duty to disclose evidence that is favorable to the defense and material to guilt or sentencing.

Second, with respect to the argument that counsel were deficient because they did not object to the trial court's ruling that the state was required to turn over only evidence in its possession, petitioner faults trial counsel for not relying on *Kyles v. Whitley*, 514 US 419, 437, 115 S Ct 1555, 131 L Ed 2d 490 (1995), which held that the prosecution has an affirmative "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." The post-conviction court denied this claim because (1) *Kyles* was decided about five months after the criminal court granted in part the *Brady* motion and (2) petitioner did not establish prejudice given that she did not identify any favorable evidence that was withheld by the prosecution as a result of counsels' failure to object. The court did not err.

We acknowledge that the record does not support the post-conviction court's finding that the United States Supreme Court issued *Kyles* after petitioner's *Brady* motion— the record shows otherwise. But the post-conviction court correctly ruled that petitioner failed to sufficiently identify the content of any *Brady* material withheld by the state and to demonstrate how it resulted in prejudice. *See Fisher v. Angelozzi*, 285 Or App 541, 548, 398 P3d 367 (2017) (the components of a *Brady* violation include that the evidence was favorable to the accused and that prejudice resulted from its suppression). Third, with respect to petitioner's claim that her counsel were deficient for not objecting to the prosecution's statement that it would turn over information only about testifying witnesses, petitioner again relies on *Kyles*. The post-conviction court denied this claim for "lack of specificity," because it was "unclear what the prosecutor allegedly said or when," and because it determined that petitioner did not establish either deficient performance or prejudice. The court did not err in doing so because, again, petitioner failed to identify the content of any *Brady* material that was withheld by the state as a result of counsels' failure to object and, consequently, failed to establish prejudice.

Finally, with respect to the claim that the prosecution violated due process by destroying potentially helpful DNA evidence, petitioner has failed to address the legal

standards applicable to such a claim. *See State v. Dikeos*, 330 Or App 698, 712, 544 P3d 1020, *rev den*, 372 Or 718 (2024) ("[D]ifferent tests apply depending on whether the lost or destroyed evidence constitutes 'material, exculpatory evidence' or 'potentially useful evidence.'" (Quoting *State v. Faunce*, 251 Or App 58, 64, 67, 282 P3d 960 (2012), *rev den*, 353 Or 203 (2013).)). For that reason, we reject the argument as undeveloped.

### 4. *Litigation of pretrial motions*

Petitioner lodges additional challenges to her trial counsel's pretrial performance in her fourth assignment of error. We do not address most of them because the arguments are undeveloped—that is, petitioner has not specifically addressed the post-conviction court's ruling under the proper standard of review and/or has otherwise failed to provide a sufficient legal analysis for review.[7] *See Waldorf*, 301 Or App at 584 (declining to address undeveloped argument). Others fail for lack of prejudice,[8] are redundant[9] or depend on the admission of exhibits that, as we explained above, were properly excluded.[10]

The arguments properly before us contained in the fourth assignment of error relate to counsel's alleged failure to effectively move to suppress (1) petitioner's confession, (2) witness Armstrong's photo identification of petitioner, (3) the search of petitioner's apartment, (4) the search and seizure of petitioner's jacket, and (5) the seizure of her writings in jail.

### a. Petitioner's confession

We begin with petitioner's argument that her trial counsel performed deficiently in trying to suppress her

---

[7] This includes petitioner's arguments regarding trial counsel's failure to request a continuance and the failure to challenge Hulteng's testimony.

[8] This includes many of petitioner's arguments regarding Detrick, a state's witness at trial.

[9] This includes petitioner's argument regard alternative suspects, which was also addressed in her third assignment of error.

[10] This includes petitioner's arguments regarding trial counsel's failure to consult with or present experts on the topic of false confessions and failure to effectively cross-examine Detective Corson regarding his role in prior false confessions.

confession to killing one of the victims in defense of the other. She acknowledges that counsel did move to suppress those statements—but only on the theories that her confession was involuntary and occurred after the invocation of counsel. She argues that counsel should have also argued that her statements (1) were the product of an unlawful warrantless seizure, (2) followed the invocation of her right to silence, which she did not thereafter waive, and (3) were not voluntary in fact (as opposed to involuntary by way of a *Miranda* violation).

Petitioner's seizure and invocation arguments both rest on the premise that she was in "custody" after she requested to go home and the police refused. That contention, however, is contrary to the evidence in the record viewed properly under the standard of review, which showed that police repeatedly assented to her request before petitioner unilaterally decided to stay put and continue her conversation with police. And, with regard to her voluntariness argument, petitioner has failed to adequately address the post-conviction court's ruling or the standard of review; therefore, we reject it as undeveloped.

b.   Armstrong's identification

Next, we turn to petitioner's contention that trial counsel performed deficiently in trying to exclude Armstrong's pretrial identification of petitioner in a photo throwdown. Armstrong testified that he saw a person that looked like petitioner leave a victim's apartment without a jacket shortly after the time of the murder. That testimony was vital because other witnesses testified that petitioner was seen at the scene of the murders wearing a jacket, and that jacket was later found in the victim's apartment with blood and the victims' DNA on it. So, Armstrong was a pivotal link in the state's timeline for the night and for establishing the evidentiary value of the jacket. Petitioner acknowledges that her counsel did move *in limine* to exclude the identification, but she faults trial counsel for doing a poor job of it. Before discussing what counsel did, we start with the controlling caselaw at the time of petitioner's trial.

The seminal case at that time on the admissibility of out-of-court identifications was *State v. Classen*, 285 Or 221, 590 P2d 1198 (1979). Under *Classen*, when a defendant sought to suppress a pretrial identification, courts applied a two-step analysis: (1) it "must determine whether the process leading to the offered identification was suggestive,"[11] and (2) if it was suggestive, then "the prosecution must satisfy the court that 'the proffered identification has a source independent of the suggestive confrontation' or photographic display, or that other aspects of the identification at the time it was made substantially exclude the risk that it resulted from the suggestive procedure." *Id.* at 232 (citation omitted). Here, counsel's motion *in limine* to exclude Armstrong's identification relied on *Classen* to argue that "the photographic identification procedure was impermissibly suggestive and conducive to irreparable mistaken identity."

At the hearing on the motion, police officers testified about the procedure used for the throwdown. Detective McCrum testified that he asked Sergeant Poppen to prepare an array of six photographs for a throwdown by having a computer program arrange petitioner's mug shot with photos of five other people with similar features and similar in age. Once the photos for the throwdown were selected, Detective McCrum informed Armstrong of the identification procedures, explained that the murder suspect may not necessarily be shown in the photographs, and had Armstrong turn away while McCrum laid the photos out on the table in a 3x2 format. McCrum prepared a stopwatch timer, asked Armstrong to turn toward the pictures, and recorded that it took Armstrong three-and-a-half minutes to identify petitioner's photo. When he did so, Armstrong said, "This guy looks like him, but I'm not certain for sure."

Petitioner's trial counsel argued that Armstrong's statements (*i.e.*, that he was "not certain for sure" that the photo he identified was petitioner) showed that Armstrong did not really identify petitioner at all. Counsel also argued

_____

[11] At the first step, a trial court also looked to whether police "needlessly departed" from procedures designed to minimize suggestiveness. *Classen*, 285 Or at 232. But that analysis is only relevant if the pretrial identification is admissible as an evidentiary matter and the court is forced to proceed to a constitutional due process analysis. *Id.* at 232 n 7.

that the photo array was unlawfully suggestive for several reasons, such as petitioner sharing hair color, hair style, facial hair, facial expressions, and t-shirt color with only one other person (but not all the same person). Ultimately, the criminal trial court denied counsel's motion *in limine* to exclude Armstrong's photo identification because it concluded that Armstrong in fact identified petitioner, that the photo array was not suggestive, and that McCrum followed all procedures for photo identification.

In the post-conviction court, petitioner argued that her counsel should have argued the motion *in limine* with more rigor. The post-conviction court denied the claim, concluding that counsel's attempt to impeach Armstrong and to argue that the photo array was suggestive was not inadequate or ineffective.

On appeal, petitioner argues that her counsel should have raised a number of additional questions and arguments to challenge Armstrong's identifications. None of those arguments prevail because they either do not implicate the suggestiveness prong of the *Classen* analysis or are contradicted by the post-conviction court's implied findings of fact, which are supported by the evidence. Accordingly, we affirm the post-conviction court's determination of counsel's performance on their attempt to exclude Armstrong's photo identification of petitioner.[12]

c.   Search of petitioner's apartment

The next issue pertains to counsel's alleged failure to more effectively challenge the warranted search of her apartment, which resulted in the discovery of petitioner's "satanic" writings and the "satanic" symbols and blood on her walls.

Petitioner first contends that her counsel should have moved to suppress the discovery of the writings on the

---

[12] We reject petitioner's argument that trial counsel was deficient for not trying to exclude Armstrong's in-court identification, because petitioner failed to demonstrate that a reasonable attorney would have challenged that in-court identification under then-existing law. Similarly, we reject petitioner's argument that counsel should have sought to extend or overrule *Classen* itself because she makes no attempt to show that a lawyer exercising reasonable skill and judgment would have done so at that time.

grounds that the warrant, issued by a Clackamas County magistrate judge for petitioner's apartment in Multnomah County, did not contain a "finding that there was probable cause to believe that one or more objects of the search related to the homicides in Clackamas County as required by ORS 133.545(2)." The post-conviction court granted summary judgment on this claim. Although the issue had not been addressed by an appellate court at the time of petitioner's trial, we later observed that "[t]he plain text of [ORS 133.545(2)] does not require a trial court to make any explicit findings." *State v. Chamu-Hernandez*, 229 Or App 334, 346, 212 P3d 514, *rev den*, 347 Or 43 (2009) (holding that ORS 133.545(2) "does not require an issuing magistrate to make express findings of fact when issuing an out-of-district warrant"). Thus, trial counsel were not ineffective for failing to make an argument based on the lack of express findings in the warrant. That means there is no genuine issue of material fact for that issue, and the superintendent was entitled to summary judgment as a matter of law on this point. *See Putnam*, 278 Or App at 388 (summary judgment standards).

Petitioner's second argument pertaining to the search of her apartment contends that counsel should have argued a better motion to controvert the warrant authorizing the search. She acknowledges that her counsel did, in fact, file a motion to controvert in which counsel challenged "the good faith, accuracy and truthfulness of the affiant" who presented the warrant affidavit, but she argues that her counsel failed to allege any specific bad faith, inaccuracies, or untruthfulness contained within the warrant affidavit. And she argues that her counsel should have challenged the overbreadth of the warrant itself. The post-conviction court rejected her arguments on prejudice grounds, ruling that petitioner failed to identify what particular writings were seized pursuant to the search warrant and failed to point to the location in the record where that evidence was admitted against her at trial.

The court did not err. First of all, petitioner does not explicitly address the post-conviction court's ruling or apply the standard of review. Beyond that, the post-conviction court was correct that petitioner failed to identify

the writings that were seized and failed to locate where they were admitted against her, which was critical because petitioner voluntarily turned over at least some of her writings to police on the day of the warranted search and even more while she was in pretrial custody. Thus, without particularly identifying which writings would have been suppressible under a proper motion to controvert, petitioner failed to demonstrate prejudice.

### d.   Seizure and search of petitioner's jacket

Petitioner next argues that her trial counsel failed to adequately challenge the warrantless seizure and search of her black jacket found in petitioner's backpack in the victims' apartment. She recognizes that her trial counsel moved to suppress the jacket for lack of a warrant or valid consent but contends that they failed to move for suppression based on lack of probable cause or exigent circumstances. The post-conviction court denied this claim based on its conclusion that petitioner had abandoned her backpack and, therefore, had no possessory or privacy interest in the backpack. On appeal, petitioner does not challenge the basis of the post-conviction court's ruling, aside from summarily stating that it was incorrect, and fails to discuss the status of abandonment case law at the time of her trial. Accordingly, we reject the argument as undeveloped.

### e.   Seizure of petitioner's writings

Finally, petitioner argues that trial counsel were deficient for failing to challenge the unconstitutional seizure of her writings while she was in jail. The superintendent objects to us considering this assertion because petitioner did not raise the claim in her petition for relief (although petitioner did raise it in her trial memorandum), the post-conviction court did not explicitly rule on the issue, and therefore the claim is not properly before us. In reply, petitioner argues that she raised the arguments at the post-conviction court, but the superintendent never objected to them on procedural grounds, which petitioner argues "den[ied] petitioner the opportunity to make a different record to amend her petition to plead such a claim."

We assume without deciding that petitioner's argument is properly before us because the superintendent impliedly consented to an implicit amendment of the petition pursuant to ORCP 23 B. *See Ogle v. Nooth*, 365 Or 771, 788, 453 P3d 1274 (2019) ("[A] party's failure to object to evidence that is clearly directed to a new issue constitutes implicit consent to trial of that issue."). And, because petitioner does not assign error to the post-conviction court's failure to explicitly rule on this argument, we assume that the court implicitly denied the claim and apply the standard of review accordingly.

The factual predicate for petitioner's argument is that jail staff unconstitutionally seized her writings from her cell during a shakedown. According to petitioner, those writings included an Order of the Black Dove membership list that was a "major item of evidence" at trial. The problem is that there is evidence in the record sufficient to support the post-conviction court's implicit finding that petitioner gave that membership list to a deputy. Indeed, the deputy testified at the criminal trial that petitioner gave him the materials, and petitioner now concedes that she did share some of her writings with the deputy. In an attempt to rebut that evidence, petitioner argues that—based on the timeline of the dates on various pages before and after the membership list—that the only plausible inference is that the membership list was seized during the shakedown. But petitioner's logic cuts both ways. The same batch of writings at issue contain journal entries from before *and after* the date of the shakedown, making the actual source of the entries unclear. Thus, there is sufficient evidence in the record to uphold an implicit factual finding that the membership list was given to the deputy voluntarily, and therefore, trial counsel lacked a basis to seek suppression of the list. Accordingly, the post-conviction court did not err.

5.  *Guilt-phase investigation*

In the sixth assignment of error, petitioner contends that her counsel performed deficiently in failing to investigate various matters. We do not discuss most of them because petitioner either failed to establish prejudice[13] or

---

[13] This includes all arguments relating to the murder weapon that are not explicitly addressed, to DNA population frequencies, and to fingerprint standards.

failed to articulate why the post-conviction court's ruling was erroneous,[14] or else they rely upon properly excluded exhibits.[15] As explained above, to establish prejudice in a claim alleging a deficient investigation, the petitioner must present evidence to establish what an adequate investigation would have found. Here, petitioner largely failed to do so. The one argument that warrants discussion relates to petitioner's claim that her counsel failed to adequately investigate the lack of damage to the murder weapon. Ultimately, though, the post-conviction court did not err in denying that claim for relief.

> a.  Failure to retain experts to investigate murder weapon

Petitioner claimed as a basis for relief that her trial counsel performed deficiently in failing to retain expert assistance to investigate the lack of damage to the purported murder weapon. At the criminal trial, the prosecution introduced Trial Exhibit 54,[16] a photograph of a tantō knife (a short sword), which the prosecution claimed was the weapon petitioner used to murder the victims. Petitioner argues that the tantō's blade was relatively undamaged, which was inconsistent with the prosecution's theory that the victims were stabbed over 20 times with that weapon while they were lying asleep on a rocky riverbank. By retaining experts, petitioner argues that counsel could have evaluated whether there was a viable argument that it was not actually the murder weapon.

In support of the claim, petitioner introduced at her post-conviction trial the declarations of two experts: William Harsey, an expert in knives and metallurgy, and Dr. Steven Symes, a forensic anthropologist. Briefly stated, Harsey explained that the photographed tantō did not show significant dulling or damage to the tip of the blade. He opined that, if the tip of the blade had cut through the bodies

---

[14] This includes arguments relating to the failure to challenge criminalist Scarpone's testimony and to address DNA contamination on petitioner's jacket.

[15] This includes an argument about the failure to challenge preliminary blood test results.

[16] This is a different Exhibit 54 than the Exhibit 54 excluded by the post-conviction court.

of the victims and to the basalt beneath the victims—as it appeared it should have given the autopsy reports showing deep wounds—the knife should have had "noticeable damage or defect on the blade." Similarly, Symes opined that the sword would have been "susceptible to severe damage when used in a violent manner near the ground in terrain such as where the victims were found."

The post-conviction court denied the claim for relief. It reasoned that a reasonable trial attorney could "choose not to present evidence about speculative possible damage the murder weapon may have received" in committing the murders and that a reasonable trial attorney could opt to forego a defense theory that necessarily accused police of illegally planting false evidence. The court also found that petitioner failed to prove prejudice because neither Harsey nor Symes foreclosed the possibility that the minor damage found on the blade was the result of the murders and did not prove that more damage would have necessarily resulted from the murders.

It may be that the post-conviction court erred in concluding that trial counsels' performance was constitutionally adequate. That is because the tactical decision to abandon a possible defense theory must itself be premised on an adequate investigation. *See Richardson*, 362 Or at 256 (explaining that tactical decisions "must be based on 'a reasonable investigation,'" unless counsel has a reason to think that an investigation would be "'fruitless or even harmful'" (quoting *Johnson*, 361 Or at 703, 709)); *Lichau*, 333 Or at 360 ("[E]ach decision to limit investigation of a particular defense itself must be a reasonable exercise of professional skill and judgment under the circumstances."). And it appears that trial counsel failed to investigate whether there was a reasonable basis in fact to argue that the state's purported murder weapon was not actually the murder weapon based on the lack of damage to the blade.

However, even assuming that the post-conviction court erred in that regard, we find no error in its alternative ruling that petitioner failed to demonstrate prejudice. As we explain below, both Harsey's and Symes's declarations left open the possibility that the photographed knife was

in fact the murder weapon, notwithstanding their reservations about the lack of damage to its blade, and there was substantial evidence to corroborate the state's theory that it was the murder weapon. Therefore, an investigation revealing the less-than-expected damage to the blade would not have had "more than [a] mere possibility" of affecting the outcome of the criminal trial such that it could have been different had counsel performed differently. *Green*, 357 Or at 322.

First, neither expert's declaration foreclosed the possibility that the tantō was the murder weapon. Symes's report was chiefly concerned with whether the victims' wounds matched the blade profile of the tantō's blade, and ultimately, he could not rule it out. In reaching that conclusion, he explained that he would expect at least *some* defects in the blade from the murders:

> "Certainly the victims were associated with sleeping bags and possibly Styrofoam pads that were used to separate them from the rocky terrain, *I would certainly be concerned if I found no defects on the assaulting weapon*, since [t]his weapon was used on supine individuals with actually very little separating them from the rocky terrain. It's hard for me to imagine that if a tantō was used, the blade is long and thin, particularly at the point, and this blade would be susceptible to severe damage when used in a violent manner near the ground in terrain such as where the victims were found."

(Emphasis added.) But importantly, he did not say that he *was* concerned by the lack of defects, as he observed that the "knife tip has been bent to the right." He suggested that the bent tip may have resulted from using the blade "to pry open objects," but he nevertheless observed some defect in the blade.

Similarly, Harsey documented a "minor bend" and "micro chipping" at the tip of the blade but, "[u]nable to determine the alloy of steel or quality of [the blade's] heat treat (hardness)," he could not opine as to "how much force would be required to make this slight bend." He described the damage as "an impact defect to the very point of the tip." Although he did not opine that it could have been caused

by the murders, his description of its possible cause at least allows for the possibility that it was caused by stabbing the victims:

> "It is very difficult to guess what may have caused the micro chipping of the blade without knowing the hardness and strength of the steel. These defects by themselves do not indicate this was a murder weapon. The very small impact defect to the very point of the blade is called 'upsetting' and this means the point had to hit something harder than the steel it was made from. Many common accidents or mishandling could have caused this and no conclusion can be drawn from this observation."

In short, both experts observed *some* damage to the tip of the blade but opined only that they would have expected *more* damage from a strike to the rocky ground beneath the victims. Importantly, however, neither expert—nor any other evidence that we are aware of—established that the murder weapon necessarily would have struck rock beneath the victims. In fact, Symes noted only two instances where the murder weapon penetrated through the body of a victim. Instead, both experts worked off the presumption that the blade would have repeatedly hit rock. Therefore, the absence of evidence to show that the murder weapon would have actually struck rock severely undercuts petitioner's prejudice argument.

Second, there was a substantial amount of evidence to corroborate that the tantō was the murder weapon: (1) after petitioner confessed to one of the murders, she showed police the area where she had discarded the weapon, and it was found there the next day; (2) both victims' blood was found on the blade; (3) as Symes confirmed, the shape of the blade was not inconsistent with the shape and depth of the stab wounds; and (4) one of the victim's friends confirmed that she had seen the tantō at one victim's apartment before the murders. In light of that corroborating evidence, the only viable theory for establishing that the tantō was *not* the murder weapon was that it was illegally planted by police. But even then, the likelihood that a knife owned by one of the victims happened to be consistent with the size and shape of the stab wounds would be extremely coincidental, to say the least.

In the end, had trial counsel obtained an expert analysis of the blade, they would have learned that the tantō displayed less damage than would be expected if the blade hit basalt beneath the victims, but that analysis would not have foreclosed the tantō as the murder weapon. And, in light of the evidence corroborating the tantō as the murder weapon, the post-conviction court could properly conclude that such an ambivalent expert analysis would not have had more than a mere possibility that it could have led to a different outcome in the criminal trial. Accordingly, the court did not err in denying that claim for relief.

b.    Failure to investigate timeline and alibi

In her third assignment of error, petitioner alleges that her trial counsel rendered inadequate and ineffective assistance of counsel because they failed to conduct an adequate guilt-phase investigation. Petitioner raises ten arguments in that assignment of error, addressing numerous claims ranging from counsel's alleged failure to investigate petitioner's account of events on the night of the murders in order to compare it against the state's account to counsel's alleged failure to locate and investigate additional witnesses and suspects. The post-conviction court denied relief on the claim because it determined that petitioner did not establish either deficient performance or prejudice.

The court did not err. Again, when a petitioner alleges that trial counsel failed to conduct an investigation, they "must adduce evidence at the post-conviction hearing that would have been discovered and introduced at the criminal trial had trial counsel undertaken the proposed investigation." *Short*, 195 Or App at 729; *accord Horn v. Hill*, 180 Or App 139, 148-49, 41 P3d 1127 (2002) ("Where evidence omitted from a criminal trial is not produced in a post-conviction proceeding * * * its omission cannot be prejudicial."). Petitioner has not produced the evidence that her trial counsel would have discovered and introduced had they undertaken the investigation she claims they should have.[17]

_____

[17] One exception is in regard to petitioner's argument that trial counsel was deficient for failing to obtain testimony from two prisoners who would have rebutted another prisoner's claim that petitioner confessed to committing murder. On that point, we simply determine that the post-conviction court did not err in concluding that any such deficiency was not prejudicial.

At most, petitioner speculates about the evidence that her counsel may have found had they conducted an adequate investigation, but that alone does not meet the required standard in failure-to-investigate cases.

B. *Guilt Phase of Trial*

In her seventh assignment of error, petitioner challenges her trial counsel's performance during the guilt phase of the criminal trial, presenting four arguments.

First, she argues that her counsel failed to investigate, develop, present, and argue appropriate defenses. But that argument is premised upon other arguments contained in her third, fourth, and sixth assignments of error. Because we have already rejected those arguments in this opinion, we reject this argument as well. And, to the extent petitioner makes a new argument that her counsel failed to timely file a notice of an alibi defense, she does not acknowledge the post-conviction court's denial of that claim, which was grounded on her failure to carry her burden of production, and we see no reason to disturb that ruling.

Second, petitioner contends that her trial counsel rendered deficient performance in their cross-examination and impeachment of certain witnesses or, when necessary, failed to make a sufficient offer of proof. Again, however, petitioner's arguments here depend on other arguments in other assignments of error that we have rejected on the merits or as undeveloped (*e.g.*, the post-conviction court's exclusion of Exhibit 54). Petitioner does not present or adequately develop any additional arguments separate from those presented in those other assignments of error, and so we reject her arguments here for the same reasons.

Third, she argues that, had her trial counsel investigated the case better early on, better argued pretrial matters described above, and better argued the *Brady* motion, the evidence from those efforts would have provided sufficient ground for counsel to pursue an actual-innocence theory. Again, however, we have already rejected other arguments on which this point relies, and so we affirm the post-conviction court's conclusion that petitioner "does not identify any material evidence that would have established

[her] innocence, or reasonable doubt as to [her] guilt or [her] intent."

Finally, she contends that trial counsel should have objected to numerous parts of the prosecution's closing statements on the ground that those statements were not supported by the record. Petitioner's arguments on this point do not assert error in the post-conviction court's denial of the claim after it made detailed findings and rulings on each statement, so we decline to address them. *See Waldorf*, 301 Or App at 584 (declining to address undeveloped argument). The remaining arguments on this point suffer from the same flaw of not addressing the post-conviction court's rulings, and we decline to address them for that reason.[18]

## C.   *Penalty Phase of Trial*

A person convicted of aggravated murder is entitled to present mitigation evidence that militates against the imposition of the death penalty. ORS 163.150(1). Mitigation evidence does not need to be evidence related to the offense. *State v. Wagner*, 309 Or 5, 19, 786 P2d 93, *cert den*, 498 US 879 (1990). Instead, mitigation evidence may include, but is not limited to, evidence about the petitioner's age, the extent and severity of their prior criminal conduct, the extent of the mental and emotional pressure under which the petitioner was acting at the time the offense was committed, and any aspect of defendant's character and record. ORS 163.150(1)(c)(A); *Penry v. Lynaugh*, 492 US 302, 319, 109 S Ct 2934, 106 L Ed 2d 256 (1989). Mitigation evidence in aggravated murder cases is intended to allow for "the jury's exercise of a reasoned moral response to the question, 'should [petitioner] receive a death sentence?'" *Wagner*, 309 Or at 19.

With respect to her trial counsel's performance at the penalty phase of the criminal trial, petitioner contends that the post-conviction court erred in denying her claims for relief predicated on the assertion that her trial counsel rendered inadequate and ineffective assistance of counsel in failing to (1) conduct a timely investigation into mitigation

---

[18] We reject, as inadequately developed, petitioner's argument that her counsel was constitutionally inadequate for failing to make adequate closing arguments, to present or object to certain jury instructions, to move for a judgment of acquittal, or to move for a new trial.

evidence for the penalty phase of trial, (2) seek a continuance at the request of the mitigation investigator, and (3) present a coherent theory of and/or sufficient mitigation evidence at the penalty phase to militate against the imposition of the death penalty. She also contends that the post-conviction court erred in denying her claims for relief predicated on the assertion that her trial counsel failed to advise petitioner to testify or make a statement in allocution, and failed to challenge the prosecution's incorrect assertions, misrepresentations, and arguments on the issue of future dangerousness.[19] We address each argument in turn.

1.  *Timeliness of mitigation investigation*

Petitioner contends that her trial counsel were inadequate and ineffective for failing to conduct a timely mitigation investigation because, she submits, her defense team did not begin a mitigation investigation until July 1995, about a year after petitioner was indicted and only four months before the penalty phase. Petitioner argues that her defense counsel did not begin a mitigation investigation until they hired Teresa McMahill, a mitigation specialist, in July 1995.

The post-conviction court denied this claim for relief. The court first stated that "there is no constitutional standard for the amount of time guaranteed to a criminal defendant [to conduct a mitigation investigation]." The court then concluded that when McMahill joined the defense team in July 1995, McMahill "joined an ongoing mitigation investigation rather than starting a new mitigation investigation." The court determined that petitioner's defense team began an investigation into mitigation evidence a soon as they were appointed to represent petitioner, and that the fact that McMahill was the only person on the defense team to call herself a mitigation specialist was not determinative of the timing of counsel's investigation.

The post-conviction court did not err in denying this claim. As stated by the post-conviction court, "there is

---

[19] In both the second and eighth assignments of error, petitioner lodges additional challenges to her trial counsel's performance that we do not address because they are undeveloped and do not identify any error in the post-conviction court's ruling.

no constitutional standard for the amount of time guaranteed to a criminal defendant [to conduct a mitigation investigation].” Indeed, the case law on failure-to-investigate cases has always centered on the substance of trial counsel’s investigation and presentation of that evidence. *See e.g.*, *Sparks v. Premo*, 289 Or App 159, 177, 408 P3d 276, *rev den*, 363 Or 119 (2017), *cert den*, 586 US 1023 (2018) (rejecting the petitioner’s contention that counsel’s decision to hire a forensic analyst a few weeks before the criminal trial was inadequate performance because the petitioner did not present evidence that the time of hiring “hampered [the analyst’s] ability to properly prepare for petitioner’s defense” in light of counsel’s presentation of mitigation evidence); *Montez*, 355 Or at 12-25 (analyzing counsel’s performance regarding the mitigation investigation and presentation of that evidence in light of the state’s evidence and theory of guilt); *Washington v. Kelly*, 333 Or App 235, 250-52, 552 P3d 80, *rev den*, 372 Or 787 (2024) (looking to counsel’s performance to determine whether the investigation and presentation of mitigation evidence was constitutionally adequate); *Maxfield v. Cain*, 322 Or App 405, 408-416, 520 P3d 890 (2022) (concluding that counsel performed deficiently in failing to present any mitigation evidence). The record supports the post-conviction court’s finding that petitioner’s trial counsel began their mitigation investigation as soon as they were appointed to represent petitioner. Again, the post-conviction court did not err in so concluding.

2.  *Failure to request a continuance at the request of the mitigation investigator*

Relying on her submission that trial counsel did not begin a mitigation investigation until July 1995, when McMahill was brought on to the defense team, petitioner next contends that trial counsel should have moved for a continuance of the penalty-phase trial to allow McMahill more time to conduct a mitigation investigation. She claims that, had McMahill had more time to conduct a mitigation investigation, McMahill would have obtained additional evidence that could have aided counsel in their mitigation argument; specifically, petitioner claims that, with more time to build a relationship with petitioner, McMahill would have

obtained a Social Security record indicating that petitioner may have been sexually abused at an institution where she was housed as a juvenile.

Trial counsel testified that they did not recall whether they sought continuances, but also testified that, had McMahill asked for one, they would have sought one. Indeed, McMahill herself could not recall whether she asked for a continuance, and even if she did, she could not recall why she would have asked for one; she stated that her only "recollection" about ever having asked for a continuance was included in her notes. McMahill's notes were in a check-list format in which she wrote the word "continuance" on a list, which to her indicated that she did ask counsel for a continuance.

The post-conviction court found McMahill's testimony about feeling like she needed more time to investigate petitioner's case not credible. That credibility finding is binding on us, *Perkins*, 332 Or App at 295, and is dispositive of this claim. In any event, petitioner has not explained how, if counsel had asked for a continuance for McMahill to obtain the Social Security record and introduce it at the criminal trial, the presentation of that Social Security record could have militated against the imposition of the death penalty. For that reason, petitioner does not prove that any alleged deficiencies in failing to ask for a continuance prejudiced her. As a result, the post-conviction court also did not err in concluding that petitioner failed to demonstrate prejudice.

3.  *Mitigation theory and sufficient evidence*

Petitioner contends that her trial counsel performed inadequately because they failed to present a coherent mitigation theory and/or sufficient mitigation evidence. The post-conviction court denied the claims, reasoning that trial counsel:

"pursued a mitigation strategy that (1) humanized petitioner—explained how her family history damaged a sweet and loving child, (2) explained family and psychological problems that tarnished her life and prospect[s], (3) diminished her conduct to the extent her serious mental disorders affected her ability to control her actions, (4) ensured the jury that a life sentence was a serious and complete

punishment, and (5) gave jurors an explanation as to why she did not deserve death."

The court did not err.

The record supports the court's determination that petitioner's defense counsel had a coherent theory of mitigation. Although we will not reprise the entirety of the defense's mitigation theory, we agree with the post-conviction court that counsel focused on a mitigation theory that humanized petitioner; explained that her violent, aggressive, and antisocial behavior was the result of internal and external forces outside of her control; and argued that the best way to keep petitioner in line was with a regimented and supervised living environment. "The fact that petitioner would, in retrospect, have implemented [her] mitigation defense in one or more different ways is not a ground for post-conviction relief if counsel acted reasonably in presenting the defense that they did." *Montez*, 355 Or at 24. The record supports the post-conviction court's determination that petitioner's counsel provided a reasonable and coherent mitigation theory that allowed the jury to provide a reasoned moral response to the question, "should [petitioner] receive a death sentence?" *Wagner*, 309 Or at 19.

As for the sufficiency of mitigation evidence, petitioner contends that her counsel failed "to discover, present, and explain to the jury [an] abundance of other available mitigation evidence," such as evidence related to "her mental health and mental illness, prior diagnoses of mental illness, family history of mental illness, her inability to function independent[ly] as an adult, her substance abuse/self-medication, and the effect her execution would have on her family, along with evidence of other positive character traits." Petitioner argues that her trial counsel should have included testimony about her childhood abuse and neglect, sexual abuse of petitioner as a juvenile, testimony from her younger sisters, more evidence about her mental illness, more evidence of her behavior and developmental disorders, evidence from adult-treatment providers, and evidence about petitioner's disabilities closer to the time of the murders.

The post-conviction court rejected that claim for relief, concluding that trial counsel's presentation of

mitigation evidence was adequate, and that their mitigation theory was adequate. In so doing, the court noted that defense penalty-phase witnesses "generally testified to all of the evidence that petitioner identifies." The court did not err.

A criminal defense lawyer is not required to investigate or introduce "every shred of evidence regarding [a] petitioner's background, psychological makeup, or other factors that the jury might possibly have found to be mitigating; rather, the standard under Oregon law is whether [the] petitioner proved by a preponderance of the evidence that [their] defense counsel failed to exercise reasonable professional skill and judgment." *Montez*, 355 Or at 16. Given that standard, the post-conviction court's conclusion that the evidence petitioner seeks would have been cumulative of the evidence counsel did present was legally correct.

Further, the court's factual finding that petitioner's counsel did present the evidence that petitioner claims was not presented is supported by the record. The record demonstrates that defense witnesses testified to all of the evidence that petitioner now argues should have been presented: petitioner's childhood abuse and neglect, petitioner's mental illnesses, and her behavior and developmental disorders. Although defense counsel did not present testimony from petitioner's younger sisters or from adult treatment providers, those omissions were not prejudicial to petitioner. She does not explain what her younger sisters would have testified to. *Horn*, 180 Or App at 148-49 ("Where evidence omitted from a criminal trial is not produced in a post-conviction proceeding * * * its omission cannot be prejudicial."). As for the adult treatment providers, petitioner claims that those providers would have testified that "her behavioral problems originated with her mental-health problems and did not necessarily indicate a criminal mindset." Several mental health professionals testified that petitioner had a rough upbringing that, paired with her birth conditions, caused severe mental instability in her to the point of her not being able to control her aggressive and violent behavior. Accordingly, the court did not err in rejecting this claim for relief.

We now turn to arguments made in petitioner's eighth assignment of error.

#### 4.  *Right to allocution*

Article I, section 11, of the Oregon Constitution provides a criminal defendant the right to allocution, that is, "the right *** to be heard by [themselves] and counsel." That right allows a criminal defendant to personally make a case for sentencing mitigation before the imposition of a sentence. *State v. Ross*, 331 Or App 570, 571, 546 P3d 960 (2024) (internal citations omitted). Denying a defendant the right to make a statement before sentencing violates the allocution right. *Id.* However, the right to allocution can be waived by a defendant's counsel. *State v. Juarez-Hernandez*, 333 Or App 794, 796, 553 P3d 1068, *rev den*, 373 Or 119 (2024) ("Because defendant did not in any way indicate to the court that he wished to speak, nor does he now argue that the right cannot be exercised by counsel, the court did not deny him the right of allocution.").

Following the penalty phase of the criminal case, after the parties rested their mitigation arguments, the trial court asked defense counsel whether petitioner intended to make any statement in allocution, to which counsel responded, "No, Your Honor. That would be waived." The trial court's question came about because, prior to trial, petitioner's counsel filed a motion to allow petitioner to make a statement in allocution with a supporting memorandum, and the trial court granted it. Petitioner later sent a letter to trial counsel, in which she wrote, "It is up to me whether or not I take the stand."

Petitioner argued to the post-conviction court that her trial counsel were inadequate and ineffective for failing to advise petitioner about her right to testify, her right to make a statement in allocution at the penalty phase, and for failing to ensure that her waiver of such rights was knowing, intelligent, and voluntary. In support, she cites her testimony in the post-conviction court in which she stated, in response to a question about whether she "recall[ed] having conversations with [her] attorneys about whether or not [she] should testify," "Yeah, they told me that I wasn't going to testify." She stated that counsel told her that "it was their decision and that it was their opinion that I needed to—you know, everything was fine and I should just leave things as

they were." She further stated that she did not have "any knowledge about whether or not [she] had the right to take the stand"; she "thought that was a decision the attorney makes."

The post-conviction court found petitioner's testimony not credible. As discussed below, that credibility determination is binding on us and is supported by the record. As to petitioner's knowledge of the right of allocution, trial counsel testified that they did speak to petitioner about whether to testify and that they would not take any case to trial without having discussed that right, testimony that the post-conviction court accepted as true. Additionally, before trial, the trial court granted counsel's motion to allow petitioner's statement in allocution with a supporting memorandum, and petitioner sent her counsel a letter to counsel in which she wrote "It is up to me whether or not I take the stand." Indeed, petitioner testified in the post-conviction court that she "believed it was my choice [to testify], not [counsel's]." Given petitioner's conflicting testimony about her knowledge of the right of allocution, the post-conviction court was entitled to determine petitioner's testimony not credible on that point. That credibility finding is binding on this court and is dispositive. *Perkins*, 332 Or App at 290; *Newmann v. Highberger*, 330 Or App 229, 234-35, 543 P3d 172, *rev den*, 372 Or 588 (2024) (citing *State v. Johnson*, 335 Or 511, 523, 73 P3d 282 (2003) (appellate court bound by factfinding court's "finding that a party's evidence is not sufficiently persuasive")).

As for whether petitioner's waiver of that right through counsel was knowing and voluntary, the post-conviction court concluded that "[t]here is no showing that that waiver [of the right to make a statement in allocution] was not voluntary and knowing." On appeal, petitioner contends that the post-conviction court erred in that conclusion because, in her view, the court shifted the burden of persuasion from the superintendent to her. The argument does not square with the fact that the burden of production in post-conviction cases is always borne by the petitioner. ORS 138.620(2); *Montez*, 355 Or at 6-7. Petitioner's only proof offered to show that the waiver of her right of allocution was

not knowing or voluntary was her own testimony, which the post-conviction court found not credible. That leaves no credible evidence to support petitioner's contentions.

Finally, petitioner does not argue that her counsel did not have authority to waive her right to allocution when the trial court asked. Had petitioner intended a different decision, she could have indicated that she wished to be heard. *Juarez-Hernandez*, 333 Or App at 796; *see State v. Bishop*, 336 Or App 161, 167, 559 P3d 950 (2024) ("Defense counsel argued for mitigation before sentencing and interrupted the court mid-sentencing, but never indicated that [the] defendant wished to be heard."). Accordingly, the post-conviction court did not err in rejecting petitioner's claim regarding her right to allocution.

5. *The prosecution's allegedly incorrect assertions, misrepresentations, and arguments regarding future dangerousness*

Petitioner contends that her trial counsel were inadequate and ineffective for failing to challenge the prosecution's incorrect assertions, misrepresentations, and arguments on the issue of future dangerousness. She asserts that her counsel should have done more to challenge certain of the state's arguments on the future dangerousness issue, but only claims error in the post-conviction court's judgment on one: that trial counsel failed to object to Dr. Richard Hulteng's references to petitioner's alleged childhood "sexual acting out."

The claim is premised on state witness Hulteng's testimony that petitioner was committed to a mental health facility because, according to the facility, she was "reportedly exposing herself to her sisters," which Hulteng described as "sexual acting out." Petitioner argued to the post-conviction court that her counsel should have objected to Hulteng's testimony because it was inadmissible hearsay. Although petitioner does not develop this argument further, it can be assumed that her contention is that, because Hulteng's testimony was relaying a statement from the facility, Hulteng could not testify to the reasons for petitioner's commitment.

The post-conviction court rejected this argument because it determined that Hulteng's testimony was

admissible under the OEC 803(4) exception to hearsay state-ments because the challenged statements were offered as "statements * * * made for the purposes of medical diagno-sis or treatment and describing [the] inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

On appeal, petitioner argues that the post-conviction court erred in concluding that the testimony was admissible under OEC 803(4) because, at the time of petitioner's trial in 1995, we had held that OEC 803(4) allowed only the state-ment of an alleged victim of sexual abuse "when it is shown that a physician reasonably relied on the victim's identifi-cation of her abuser as a family member in diagnosing or treating the victim," and then "the physician may testify about the victim's identification of her abuser." She contends that Hulteng's testimony was not based on an out-of-court statement of a purported victim or of a physician diagnos-ing the victim as required by *State v. Vosika*, 83 Or App 298, 309, 731 P2d 449, *adh'd to as modified on recons*, 85 Or App 148, 735 P2d 1273 (1987). Petitioner's argument is unavailing.

A declarant's out-of-court statement is admissible under OEC 803(4) if it is "made for purposes of medical diag-nosis or treatment and describing medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." OEC 803(4); *Dept. of Human Services v. J. G.*, 258 Or App 118, 123, 308 P3d 296 (2013); *State v. Moen*, 309 Or 45, 55, 786 P2d 111 (1990). The rule was the same in 1995 at the time of petitioner's trial. *See e.g.*, *Vosika*, 83 Or at 303; *State v. Barkley*, 315 Or 420, 424, 846 P2d 390 (1993). *Vosika*, on which petitioner relies, does not say anything to support her contention that a statement is admissible under OEC 803(4) only if it comes from a victim of sexual abuse or a physician. Indeed, "OEC 803(4), by its terms, does not require that the declarant be the person diagnosed or treated. Rather, the rule refers broadly to 'statements' describing their purpose and nature, without any reference to the declarant's status." *State ex rel Juv. Dept. v. Pfaff*, 164 Or App 470, 481, 994

P2d 147 (1999), *rev den*, 331 Or 193 (2000). Thus, petitioner's reliance on *Vosika* is misplaced, and we reject petitioner's argument that the post-conviction court erred in concluding that Hulteng's testimony was inadmissible hearsay because petitioner has not demonstrated reversible error.

D.  *Direct Appeal*

        In her tenth assignment of error, petitioner contends that her appellate counsel in the direct appeal of her conviction and sentence rendered inadequate and ineffective assistance under both the state and federal constitutions in numerous ways. None of petitioner's arguments on this point assert any error in the post-conviction court's judgment denying the claims for relief, and so—as with the other undeveloped arguments—we do not address them. *Waldorf*, 301 Or App at 584 (declining to address undeveloped argument).

## IV.   CONCLUSION

        Because petitioner has not carried her burden of production to adduce evidence that she claims her trial counsel should have presented at the criminal trial, *Short*, 195 Or App at 729; has not developed many arguments asserting error in the post-conviction court's judgment, *Waldorf*, 301 Or App at 584; has advanced arguments contrary to caselaw, *Manning*, 325 Or App at 36 (cumulative error not recognized in Oregon), *Palmer*, 318 Or 352 (Supreme Court precedent that binds the Court of Appeals); did not preserve several arguments; and has otherwise not provided any reason to disturb the post-conviction court's denial of her petition for post-conviction relief or exclusion of certain exhibits, we affirm.

        Affirmed.